```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA      )
                                   )
 4          Plaintiff,             )
                                   ) CRIMINAL CASE NO. PX-16-0421
 5          vs.                    )
                                   )
 6   ROY DAVID EVANS,              )
                                   )
 7          Defendant.             )

 8
           TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING
 9            BEFORE THE HONORABLE PAULA XINIS
                UNITED STATES DISTRICT JUDGE
10          MONDAY, OCTOBER 1, 2018; 12:00 NOON
                    GREENBELT, MARYLAND
11
                  A P P E A R A N C E S
12
     FOR THE PLAINTIFF:
13
           OFFICE OF THE UNITED STATES ATTORNEY
14              BY:  TIMOTHY HAGAN, ESQUIRE
                6500 CHERRYWOOD LANE, SUITE 200
15              GREENBELT, MARYLAND 20770
                (301) 344-4516
16
     FOR THE DEFENDANT:
17
           OFFICE OF THE FEDERAL PUBLIC DEFENDER
18              BY:  ANDREW SZEKELY, ESQUIRE
                     PATRICIA L. RICHMAN, ESQUIRE
19              100 S. CHARLES STREET, TOWER II, SUITE 900
                BALTIMORE, MARYLAND 21201
20              (410) 962-3962

21         ***Proceedings Recorded By Mechanical Stenography***
                 Produced By Computer-Aided Transcription
22   _____

23            MARLENE MARTIN-KERR, RPR, RMR, CRR, FCRR
                  FEDERAL OFFICIAL COURT REPORTER
24               6500 CHERRYWOOD LANE, STE 200
                   GREENBELT, MARYLAND 20770
25                      (301) 344-3499
```

P R O C E E D I N G S

(Call to Order of the Court.)

THE DEPUTY CLERK:  All rise.

The United States District Court for the District of Maryland is now in session, the Honorable Paula Xinis presiding.

THE COURT:  Good afternoon, everyone.

If the government would call the case.

MR. HAGAN:  Calling Criminal No. PX-16-421, United States versus Roy David Evans, Junior.

Timothy Hagan on behalf of the United States.  Good afternoon, Your Honor.  I'm joined at counsel table by HSI Special Agent Christine Carlson.

THE COURT:  Okay, good afternoon.  Welcome.

MR. SZEKELY:  Good afternoon, Your Honor.  Andrew Szekely and Patricia Richman on behalf of Mr. Evans.  Mr. Evans is present to my far left this morning.

We're also joined here today by a few individuals in the gallery.  Would you like me to introduce them now, Your Honor?

THE COURT:  That would be great.

MR. SZEKELY:  We're joined by his father, Roy Evans Senior, Bradley Deis, his sister Jessica Evans, Ms. Jackie Oberio.  On our far right is our staff investigator, Elizabeth Sandman, friend of the family Cindy Stevenson, Tom Farmer, and Jeffrey Willis.

1      Additionally, Mr. Evans' Uncle John was here this morning
2 but, unfortunately, due to scheduling matters, he could not
3 come to this rescheduled procedure.
4           THE COURT:  Okay.  And I believe that almost everyone
5 has written in this case, and I've read everything that you've
6 sent, and I thank you very much for your input, as well as your
7 presence here today.
8           MR. SZEKELY:  Thank you.
9      If I could add two other things that I think will -- one
10 which will expedite this proceeding here today.
11           THE COURT:  Okay.
12           MR. SZEKELY:  The first is -- which is not the one
13 which will expedite it -- I know the Court has read a lot about
14 Mr. Evans' upbringing.  We're not planning on calling any
15 witnesses to that effect or having really anyone except counsel
16 address that.  However, his sister Jessica has expressed a
17 willingness to speak to the Court should the Court have any
18 questions.  She's present.  She'll be happy to speak to the
19 Court.  If not, then --
20           THE COURT:  I mean, my position on it is I have read
21 everything.  It's extremely traumatic and difficult for the
22 family to live and relive.  It has not been challenged by the
23 government in any way, so I don't see any point in putting your
24 sister through that, unless there is something in addition you
25 all wish for me to know.

1    MR. SZEKELY:  There is nothing additional, Your

2  Honor.

3    THE COURT:  Okay.

4    MR. SZEKELY:  And the other matter is we filed a

5  letter either late Thursday or early Friday regarding the

6  testimony -- narrowing the scope of the testimony here today.

7  Additionally, since this morning, after that letter, all that

8  would have been left would have been testimony regarding

9  Victim-1, minor number one, and what the -- essentially Count

10  One of the original Superseding Indictment would have been.

11    Ms. Richman and I have met with Mr. Evans this morning.

12  We have reviewed with him what the government's evidence would

13  be.  We've shared the government's exhibits with him --

14    THE COURT:  Is that the binder that I've been given,

15  which is why it's been shared with Mr. Evans?

16    MR. SZEKELY:  Correct.

17    MR. HAGAN:  Yes, Your Honor.

18    MR. SZEKELY:  We've discussed the contents of the

19  binder.  We've discussed the victim impact testimony we've

20  received, and based on those discussions, Your Honor, Count One

21  was left open at the time of the plea.

22    Mr. Evans -- Counsel is prepared today, after discussing

23  with Mr. Evans, to acknowledge that though there are some

24  inconsistencies in the testimony that would have been presented

25  today, given the standard of proof required here today at

1  sentencing, and having reviewed the factual proffer made by the

2  government in their sentencing submission, we will be prepared

3  to proceed by way of essentially proffer as to those facts.

4      My understanding is that the government would then not be

5  calling Special Agent Carlson for any purpose, and we would

6  just simply go, with the Court's approval of this arrangement,

7  on to discussions of the guidelines and then on to the 3553(a)

8  discussions at sentencing.

9      THE COURT:  Okay, and that is fine.  I guess what

10  I'll ask, though, is -- and I would imagine Mr. Hagan is likely

11  intending to do this, is to walk me through the significance of

12  these exhibits.  To the extent the defense disagrees with any

13  of it, let me know.  But right now I've just been given, in

14  addition to the double-sided pages on this binder that we've --

15  I've read and have been given, I've now been given up this

16  additional packet of material.

17      And so without some guidance as to why you think it's

18  relevant to the analysis, it's going to be hard for me to

19  follow in a vacuum.  Does that make sense, Mr. Hagan?

20      MR. HAGAN:  Yes, Your Honor.

21      THE COURT:  Okay.

22      All right, with that, let's start with first things first.

23  With respect to the presentence report, Mr. Evans, at -- this

24  has been filed at ECF 118.  Have you had enough time to review

25  the presentence report and discuss it with your counsel in

1 advance of today?

2 THE DEFENDANT: Yes, Your Honor.

3 THE COURT: Okay. Are there any additions,

4 corrections, or changes to the presentence report, Mr. Szekely?

5 MR. SZEKELY: Your Honor, we had asked -- I think

6 there was -- we had asked the presentence report to include

7 additional information regarding Mr. Evans' mother's history.

8 I think it was not added in, however, we've had an opportunity

9 to provide that to the Court in the form of the sentencing

10 memorandum so --

11 THE COURT: And to the extent you believe that either

12 Ms. Sandman's report or I believe the additional report that

13 you provided me would be helpful with respect to programming,

14 you may want to ask probation to attach it to the presentence

15 report.

16 MR. SZEKELY: And I will talk with -- I see

17 Ms. Blanche is here. We'll talk with Ms. Blanche after court.

18 I would like it to go up in the e-docket system so that the

19 medical staff at the appropriate institution will be able to

20 have that on hand and hopefully expedite the process.

21 THE COURT: Okay, great. Other than that, there are

22 no additions, corrections, or changes?

23 MR. SZEKELY: That's correct.

24 THE COURT: All right.

25 Mr. Hagan?

1          MR. HAGAN:  Your Honor, I think that -- hopefully we

2   clarified it in our sentencing memorandum.  There was a dispute

3   at one time about whether the defendant -- and it was contained

4   in our plea agreement as well about whether there would be

5   three extra points, from 43 to 46, in the government's position

6   with respect to relevant conduct.

7       In light of our further research and conversations with

8   pretrial, we do not -- we're no longer taking the position that

9   that counts.  We don't have any objection to the PSR as it

10  stands, the numbers that are contained therein.

11          THE COURT:  Okay, which means that everyone is in

12  agreement the final offense level is 43?

13          MR. HAGAN:  Yes, Your Honor.

14          MR. SZEKELY:  Correct, Your Honor.

15          THE COURT:  Okay.  All right.

16      Ms. Blanche, I see you in the courtroom.  I know

17  Ms. Jackson prepared this report, and if you would convey my

18  thanks to her, and thank you for being here.  It's a well-done

19  report as always.

20          MS. BLANCHE:  Certainly, Your Honor.

21          THE COURT:  All right, that means we now turn to the

22  3553 analysis.  I recognize that there is a statutory mandatory

23  minimum associated with the production count of 15 years

24  imprisonment, and that's what the defense is recommending.  The

25  government is asking for substantially more.  I would like to

1 start with the government, actually, and then move to the

2 defense.

3      Let me ask you this, just one other preliminary matter.

4 Given the resolution that you all have reached, are there any

5 other witnesses that either side wishes to call?

6           MR. HAGAN:  There are not, Your Honor.

7           MR. SZEKELY:  No, Your Honor.  Thank you.

8           THE COURT:  Okay.  All right, then I'll start with

9 you, Mr. Hagan.

10           MR. HAGAN:  Your Honor, the reason I stood out of

11 turn just a moment ago was I wanted to confirm that the Court

12 had received the Victim Impact Statements that were submitted

13 by the government.  There were, as I count, four, and I wanted

14 to make sure that the Court had all of them.

15           THE COURT:  Well, thank you for bringing that up,

16 because some of them are in a strange format, and I'm not sure

17 if I'm looking at the right thing.  I have been given one which

18 is -- it says at the top in handwriting from stepmother of V1,

19 and that's a several-page letter.  I've been given what says

20 mom at V2, which is a handwritten on the form that's provided.

21 I've been given mother of V3, which looks like a shorter email,

22 less than a page.  And then I've been given, again in

23 handwriting, what says Victim Impact Statement from V1, and

24 this is where the format gets strange.  So I have in one font

25 and then a much larger font -- and then an email from it looks

1  like the father of V1.

2     So I guess my only outstanding query is:  Is this all V1?

3  And what I'm pointing to is what looks like a text maybe that

4  starts with one kind of font going down the left side of the

5  page and then a much larger font.

6          MR. HAGAN:  Yes, Your Honor.

7          THE COURT:  Is that all from V1?

8          MR. HAGAN:  Yes, Your Honor.  We had some -- I think

9  there were some format difficulties coming in, and there were

10 some format difficulties getting it to the Court.  We didn't

11 want to -- as long as it was legible in terms of it, we wanted

12 to preserve it as we received it.

13         THE COURT:  Right, and that makes sense to me.

14     So I have seen them.  I've read them all.

15         MR. HAGAN:  Thank you, Your Honor.

16         THE COURT:  Are there any other Victim Impact

17 Statements that I should have received?

18         MR. HAGAN:  Not from the government, Your Honor, no.

19         THE COURT:  Okay.  All right.

20     Mr. Hagan, I know I'm taking it -- I usually do the

21 reverse, but you're asking for a substantial sentence, and I

22 preliminarily agree with the defense.  I'm not quite sure how,

23 based on your memorandum, they are tied into the 3553(a)

24 factors or the additional information you've given me.  So I'm

25 going to start with you.

1        MR. HAGAN:  Absolutely, Your Honor.

2     So because we're proceeding in a little bit of a different

3  fashion, I may be jumping around sometimes, because a few

4  minutes ago we may have been calling a witness and that would

5  have gone in another direction.

6     So let me first talk to the Court about the conduct that

7  we believe here -- the history and circumstances of the nature

8  of this offense or these offenses.

9     Dating back to June or July of 2015, Victim 1 moved up

10  here and relocated to Maryland to live with her stepmother,

11  step sister, father, and it was during that period of time that

12  we also know that Mr. Evans was casting out this net on

13  Craigslist, these solicitations, these advertisements for young

14  models, et cetera.  That information is explained in the

15  Statement of Facts.

16     And it was during that period of time that the victim,

17  new -- Victim 1, new to this area, new to this setting, began

18  this correspondence with the defendant.

19     I should note that Victim 1, even at that time, prior to

20  meeting the defendant, was a vulnerable person, and that was

21  not just because of her age.  She was born in 2001 and, at that

22  stage, would have been about 14 years old, having turned 14 a

23  few months prior.  But she also in her background had been the

24  victim of abuse.

25     She had been living in a situation where the boyfriend of

1   her mother had been actually found guilty of committing sexual

2   abuse against her.  She came up to live here and was in a

3   stable setting, and her -- we're fortunate to have the Victim

4   Impact Statement that was sent by the woman who was the

5   stepmother who was basically her champion through this process.

6   The person who discovered what was going on, the person who

7   made sure the police and law enforcement found out about this,

8   the person who made sure that Victim 1, the child, was where

9   she needed to be with respect to meeting with law enforcement

10  as the process continued and we prepared for trial, et cetera.

11      And in those summer months, eventually this came out to

12  the stepsister, and stepmother learned about it.  Stepmother

13  confiscated and sought what she could do to get her hands on

14  this to say what's going on?  Is there evidence of this?

15  You're on your phone all the time.  I'm hearing that you're

16  meeting with someone that's older in their 20s -- which was

17  false but it was what was said perpetrated by the defendant --

18  and wanted to get to the bottom of this, obviously,

19  immediately.

20      During that course of time, as step mom is investigating,

21  she's also deleting these horrific things that she's reading.

22  She's taking them off the device so that the child isn't going

23  to -- hopefully is not going to be able to contact whoever this

24  person is in the future.  Obviously, that ultimately

25  compromised our ability to get the evidence that we were

1  looking for.

2      And this was a reluctant victim because this victim, as

3  you will see as you begin to parse it out -- and I'll go

4  through a little bit of what was Government's Exhibit 1 here.

5  In these chats that were found from the defendant's phone,

6  these Kik Chats, it's clear that even when we find this first

7  chat, as they begin in -- and I'm referring to Government's 1,

8  Your Honor -- as they begin right around late November is the

9  first one that we recovered, it's clear that they already have

10 an existing relationship.

11     This is just as far as back as we could recover from the

12 defendant's phone, and we knew that there had been deletion of

13 what had been on the victim's phone in an effort to protect her

14 and to keep her away from the defendant.

15     What we then have from an investigative standpoint is we

16 have a victim who, candidly, believes that the defendant is her

17 older boyfriend, is in love with him, and is furious about what

18 she considers to be the betrayal of the confidence that she had

19 given within her family's structure that no one find out about

20 this and that he not get in trouble and that she not get in

21 trouble.

22     So when this is reported to law enforcement and they look

23 to have an interview with that victim, as has been referenced

24 by defense counsel, she meets with law enforcement and denies

25 any physical contact or ever meeting the defendant.  She denies

1   that they engaged in any sex acts.  She denies those things.

2        And we can go on for a long time about why that would

3   happen, but the evidence that we were hearing from stepmother,

4   the evidence that we were hearing from other folks -- the

5   stepmother said, Look, I remember what I read; I just deleted

6   it -- was that there had been sexual conduct between these two

7   where he had traveled to her.

8        And it took some time because of where she was, and she

9   was not the person who was coming forward to disclose this, and

10  it was a second interview --

11        MR. SZEKELY:  I apologize for interrupting.  May I

12  consult with the government for one moment, Your Honor?

13        THE COURT:  Sure.

14     (Brief pause.)

15        MR. HAGAN:  Your Honor, can we have a moment?

16        THE COURT:  What's that?

17        MR. HAGAN:  Can we have a moment?

18        THE COURT:  Do you need to step outside?

19        MR. SZEKELY:  No.  Mr. Hagan is just pulling

20  something from his file.  If we can just have a brief moment?

21        THE COURT:  Oh, okay.

22        MS. RICHMAN:  Thank you, Your Honor.

23     (Brief pause.)

24        MR. HAGAN:  We're ready to proceed, Your Honor.

25        THE COURT:  Okay.

1    MR. HAGAN:  I apologize.  I mischaracterized

2  something, so I want to make sure I correct the record.

3    THE COURT:  Sure.

4    MR. HAGAN:  The first interview with the victim in

5  this case, she was reluctant.  She was not giving all of the

6  information, and it was apparent that she was not comfortable

7  in the setting.  She did disclose that there was sexual

8  conduct.  All of the facts surrounding that, et cetera, not as

9  forthcoming; but I had said that she said nothing, and that's

10  false.  And defense asked about that, and they are correct to

11  be asking.  That was not accurate.

12    She was hesitant with respect to identifying the person,

13  all sorts of other areas --

14    THE COURT:  I was going to actually ask, because I

15  thought I had read that she, at a minimum, admitted to one time

16  having sex with the defendant.

17    MR. HAGAN:  So it evolves and that's what I'm getting

18  to.

19    THE COURT:  All right.  So the initial time was that

20  one time.  And then when you say it evolves, you mean her

21  disclosures?

22    MR. HAGAN:  Correct.

23    THE COURT:  Okay.

24    MR. HAGAN:  And as we might expect, disclosure is an

25  evolving process, especially when we're dealing with children.

1    What happened next was we had another interview, armed

2  with a little bit more information and evidence, having done

3  more of an investigation at that stage, and we had the

4  disclosure with respect to three times.

5    Now, the government is not proceeding at this stage, given

6  our understanding of what our own burdens are, that we would

7  prove, even by a preponderance of the evidence, necessarily,

8  that there were three; but the defense is agreeing, and we

9  believe we would have proven here in a setting and potentially

10  at trial that there was certainly at least one.

11    THE COURT:  When you say "one" --

12    MR. HAGAN:  One time involving -- one time with

13  Victim 1 involving the defendant having traveled to her house,

14  engaging in sexual conduct that we described.

15    THE COURT:  Got it.  Okay.

16    MR. HAGAN:  And as that process continues and the

17  case was originally charged locally in Montgomery County, and

18  it's adopted by my office, Victim 1 relocated, as the Court has

19  seen in the impact statement sent by her stepmother.  There

20  were some serious difficulties that continued after as this

21  process was going on.  Victim 1 no longer lives there.  The

22  breakup of the marriage.  Some really serious ripple effects

23  from this.

24    During that period of time, we also were in a position of

25  we've got to prepare for trial that's forthcoming, and we need

1  to meet with the victim and talk about what's happening as we

2  go forward, and it was during one of those prep -- a prep

3  meeting with that victim then that we met across the street,

4  and there Victim 1 was being prepped as a witness and said "one

5  time."  And we said, you know, we were aware that it was three.

6  Why are you saying now one time?  It was one time.  We

7  disclosed that, obviously, to the defense.

8      And after that meeting, we obviously spoke to the guardian

9  and said this is what's being said now, and this is what was

10  said before, as you know.  And we were told by the guardian at

11  that time, or at least by step mom that even after that

12  meeting, there was a confrontation or at least a questioning

13  why to the child did you tell the government one this time?

14  And we've talked about this before and it was three.  And the

15  answer was it's none of your business; it's none of anybody's

16  business.

17      And I think that's important when we look at what we're

18  dealing with here.  Even under the nature and circumstances

19  under 3553, we're talking about the predation on a vulnerable

20  child.  We're talking about someone who does not appreciate and

21  wouldn't be and shouldn't have to appreciate all that goes into

22  this from a prosecution standpoint, from a moral standpoint,

23  from what is the conduct that she should -- how she should feel

24  about it, how she should process it, whether she should feel

25  ashamed or guilt or anger or something different.

And that's difficult even for adult victims of any kind of sexual assault to deal with.

In this case, this is someone who absolutely wanted -- Victim 1 wanted to be appreciated and treated well and in a relationship with the defendant, and he encouraged that.

And what resulted was the breakup of that family, as the Court has seen in the impact statement. Victim 1 is now back in the place where she had come, with her mother we're told, living with the person who was her mother's boyfriend and had abused her in the first instance. That was part of the reason that she was no longer there in the first instance.

When you submit something and cast that net that the defendant did online, people wonder who in their right mind would respond to this kind of garbage, this kind of ad. The answer is children who are not, perhaps, in their right mind.

And that's part of what makes this so serious. It's not preying on people who may have been at that age better equipped -- like Victim 4 who said "enjoy prison." Who may not have been equipped to handle that, and he was able to exploit that. And when he exploited that, he didn't do what some others do, which is -- there is no evidence in this case of threats, violence. He exploited that with feelings, with the idea of a relationship, or at least that -- how much he cared, or didn't dissuade her from professing her love to him in those repeated chats.

1    We have someone who was soliciting routinely for his own
2   gratification, whether it was Victim 1 or others, routinely
3   soliciting that they do all sorts of sexual conduct, film it,
4   send it to him.
5    And in describing the nature and circumstances of the
6   offense, Your Honor, as we go through parts of Exhibit 1, there
7   are some things that I think the Court -- I would just
8   highlight that we otherwise would have gone through.  Some of
9   those have to do with highlighted areas of just how we're going
10  to meet.  You know, like the defendant and the victim talking
11  about when they are going to meet, what they are going to do
12  when they meet, how to set up the meeting.  Part of it talks
13  about Martin Luther King Day.  She may be off school that day.
14  So he'll be able to travel.  He may not have to work that day.
15  He may be able to travel.  So they set it up and they talked
16  about all of the sexual conduct that they will engage in.
17   They talk about going elsewhere because it was too loud
18  last time in the car, and they need to find a better place to
19  hide, maybe a hotel or something like that, a safe spot on the
20  18th.  That meeting January 18th of 2016 doesn't happen because
21  of scheduling.
22   In talking about how the defendant manipulated emotionally
23  Victim 1, I direct the Court to Exhibit 1, Bates Stamp Evans
24  4685.  This isn't going to be the most egregious example of
25  this, but just to corroborate what I've been telling the Court

about what was going a little bit maybe through her mind based on what he was saying. He expresses concern here and does elsewhere about whether she's been with other guys. Now, to someone -- or is doing this with other guys.

Now, to someone who is in her shoes, the way this would naturally be interpreted is that he's interested in her. He doesn't want her to be with other guys. He cares about her. This is not just about the sexual conduct. When he professes an interest or a concern, that's the message she takes.

Your Honor, the reality is the bulk of this Exhibit 1 for the government is occasional flattery in the sense of how good she looks or how great she is in one way or another and solicitations, just over and over, send me a picture of this, do this, send me a picture of that, and she's trying to please him. She's trying to do what he wants.

It is toward the end, Bates Stamp 4697, seven boxes from the top where Victim 1 has been caught, and her stepmother is now communicating that this is to stop with Mr. Evans. But as the Court can see, it picks right back up, because the enterprising 14-year old figures out a way to re-access these Kik's and get back on these chats and communicating with him now after he has been warned away by the adult.

And he continues even on the next page; send me a pic of you so I know it's you, and then asks again for a video because he crassly informs her that he misses her. And it continues.

1       Your Honor, Government's Exhibit 2 and 3 are intended

2   solely for one limited purpose, which was, as the Court may see

3   when it looks, and hopefully the Court has not been in this

4   position, but when you violate the toll, EZ Pass, you get a

5   bill.  If you didn't have enough money in your account, you get

6   a bill sent to you with a video of your vehicle and license

7   plate going through the toll plaza that you weren't supposed to

8   because your EZ Pass didn't have enough money on it.

9       The reason we sent that is because it shows -- or that we

10  were going to submit that is because it shows that on

11  November 16 of 2015, on the ICCC, the defendant was traveling,

12  and we would have argued that was one of the days or the day,

13  as it were, where they engaged in sexual conduct in the

14  Germantown area at the victim's -- near the victim's residence.

15      And part of the reason we were using that to prove is

16  because the defendant, as the Court knows from the PSR, was

17  living at the time just east, northeast of Baltimore and was

18  traveling through Fort McHenry tunnel, down 95, out the ICC,

19  out to meet her.

20      And Government's Exhibit 3 also showed from the MVA the

21  records corroborating that November 16, 2015 date that he had,

22  in fact, hit the toll plaza with his vehicle on that day.

23      It would also show that that was not a frequent thing.  It

24  was not part of his work route or anything like that.  The ICC

25  from a year's period of time, I think he traveled three times

1  in total between April of 2015 and April 2016.

2  So what makes -- when we look at the 3553(a) factors, Your

3  Honor, what makes this serious enough to merit not just the

4  sentence of the mandatory minimum, the 15, but, in fact,

5  higher; and what the government is requesting, which is a

6  significant sentence, 360 months with a lifetime of supervised

7  release, with the conditions that are requested by probation in

8  the PSR, as well as, obviously, the sex offender registry that

9  would be also required upon release.

10  Well, remember that one count of production carries that

11  penalty of the 15-year mandatory minimum.  We are nowhere -- we

12  are nowhere near that here.  And while it wouldn't be the only

13  reason, it's important to note we aren't talking about a single

14  isolated thing.  We're talking about a pattern of conduct here

15  involving multiple victims.  We're talking about an individual

16  who even when warned about prison, even when warned by adult in

17  the room, mom, without law enforcement intervention can't stop

18  or won't stop.

19  THE COURT:  Well, even -- I mean, there is

20  conversation about this child going to therapy.

21  MR. HAGAN:  Right.

22  THE COURT:  And it continues.

23  MR. HAGAN:  Toward the end, yes.

24  THE COURT:  Yes.  And disclosing to the therapist --

25  MR. HAGAN:  Being forced to go to therapy.

1      THE COURT:  -- about everything that happened when I

2  had unprotected sex with an older guy and how dangerous it can

3  be to meet someone online.  And it goes on.

4      MR. HAGAN:  This is at Evans 4703 in Government's 1.

5      THE COURT:  Yep.

6      MR. HAGAN:  With respect to the other victims, Your

7  Honor, the pattern was similar in the sense that the objective

8  here from the advertisements wasn't just the modeling pictures,

9  but it was to be in person, to interact personally.

10      And what we have with respect to Victims 2 and 3 is lots

11  of efforts made to meet, bus tickets, Uber.  How can we make

12  this happen?  You're coming from Baltimore.  I'm coming from

13  Essex.  You're coming from the D.C. area.  I'm coming from up

14  around Middle River in Essex.  You don't drive or you don't

15  have a car.  You're a minor.  Let's Uber, train, bus so that we

16  can meet.  Those don't happen, thankfully, but that is --

17  that's what the net was cast for.

18      The Craigslist net succeeded with respect to Victim 1 in

19  that way and was -- and the evidence is clear was seeking to do

20  so regardless of the fact that these were minors, with multiple

21  other victims.

22      When we look at the seriousness of the offense, I think

23  that we also need to consider the effect.  I talked a little

24  bit about the vulnerability of Victim 1.

25      Victim 3, Your Honor, is out of state, at some distance.

We had the chance, obviously, to interact with her, and we're not making arguments, because I don't think -- I think it's very difficult to prove one way or another direct traumatic link to this trauma when you talk about someone who has been repeatedly traumatized. Okay?

Victim 3, who in some ways had a very good support structure in our experience and in our interaction, Victim 3 has been reported as runaway for the last three months. She's still not -- she's 17 today, and her mother is worried sick, obviously. She was reported as a runaway, and she's been gone for three months.

I can't say that -- and no one is arguing that what Mr. Evans did caused that, but what I can tell the Court is that what Mr. Evans did with respect to Victim 3 didn't make it any better. It didn't help.

With respect to the 3553(a) factors, Your Honor, and when we want to afford adequate deterrence to criminal conduct, that deterrence has to do not just with specific deterrence but with general deterrence. The manner by which the defendant chose to operate is scarily available to anybody with Internet access.

This is a case that may warrant more consideration of general deterrence than maybe a case involving a teacher where we know, for example, that teachers are supposed to have a ton of training. The school system has an interest in making sure that these things don't happen among their employees.

1    Here, this is someone who, because he had an Internet

2  connection, was able to begin seeking out children in this way;

3  and all it took was a free ad repeated over and over to start

4  plucking out the individuals that might be vulnerable enough to

5  respond to his compliments or communications and to continue to

6  go down the path of ultimately being exploited.

7    So we think that there should be some deterrence with

8  respect to this, general deterrence, that if you go onto

9  Craigslist or whatever site to start to do these sorts of

10  things, the consequences are going to be severe.

11    Obviously, there is a protect the public aspect to this

12  when we consider the factors.  As the Court alluded to and as

13  we raised a moment ago, this is someone who had warning and

14  didn't stop.  This is someone who had warning and

15  communications from other victims and it didn't stop him with

16  respect to other ones.

17    There are many ways that the defendant could have -- I'll

18  get to that in a moment.

19    Obviously, the guidelines in this case are high.  The

20  government was in a position, based on what the offenses are,

21  et cetera, to ask for a sentence that would have been even

22  higher than what we're asking.  The guidelines indicate that

23  that's within the guidelines.  We don't believe that's

24  appropriate.  We believe it's fair to be asking for what we're

25  asking.

1    One of the things that -- that's important about

2  considering the construct that he did, the fact that he

3  continued after being caught or at least threatened with prison

4  and noted is when I had a chance to read the extensive

5  submission by defense counsel and saw how traumatic -- which we

6  take no -- we do not dispute how traumatic the defendant's

7  upbringing was.  What was really sad about this and his conduct

8  in this case was that he had other outlets that he had used as

9  a way of engaging in the risky conduct and behavior that they

10  described, ways that didn't hurt people in the same way that

11  this does.

12    No one is suggesting that it was a healthy thing for him

13  to be gambling the amount of money he was, but what it didn't

14  do was cause the effect on children and their families that

15  this conduct did.

16    That's why there needs to be more accountability, and we

17  believe a sentence that's more -- that's longer than the 15

18  years that's requested by the defense, because if this person

19  was in such a box based on his own experience that he had to do

20  things that were self-destructive or reckless, harming his

21  wife, harming his own relationships and putting those at risk,

22  what he didn't have to do is what he chose to do here, even

23  after warnings, which is go after these children, to go after

24  these young models, to solicit in a way that he did and have

25  what would have been foreseeable consequences here; 16, 15, 14,

1    17-year-old girls running away, engaging in other sexually

2    risky behaviors, failing out of school, whatever the case may

3    be.

4         That's why, a big part of why this is illegal in the first

5    place, to prevent those things from happening to children.

6         So, Your Honor, having looked at the 3553(a) factors, we

7    believe that it's appropriate to sentence the defendant to the

8    30-year sentence that we requested.  We believe that it's

9    appropriate that he serve what's required, lifetime of

10   supervised release upon his release from imprisonment, with the

11   conditions that we requested in the PSR.

12        We also know that the defendant will be required and,

13   obviously, must register as a sex offender as a way of not only

14   protecting himself from engaging in this conduct, but also

15   protecting the community if he were to do so in the future.

16        This is someone who cast a net, found people, and when he

17   figured out what their vulnerabilities were, he went and he

18   took advantage and exploited those situations.  Here he did it

19   with Victim 1 as we've shown.

20        We're grateful that they came forward.  We're grateful for

21   the Victim Impact Statements that do a better job of explaining

22   exactly how serious this is than I ever could, and we believe

23   that the sentence that the government is requesting is

24   appropriate.

25        Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Hagan.

2      Mr. Szekely?

3          MR. SZEKELY:  Thank you, Your Honor.

4      This sentencing submission that I know the Court has

5  indicated its read detailed one of the most important aspects

6  of Mr. Evans' relevant past history.  I'm not going to repeat

7  any of that here today.  Of course, if the Court wished to

8  engage any of that, I'm happy to discuss it.

9      But I really would like to focus our presentation to you

10 on two things, first responding to a little bit of what the

11 government said in their presentation but also primarily

12 focusing on the future.  I think that the Court has at this

13 point from all the submissions a very good sense of what the

14 past was in terms of the defense conduct and Mr. Evans'

15 personal history.  We know what sort of the present is, which

16 is this proceeding.  But what does the future bring?

17     But first I would like to address two points that the

18 government raised.  First is on the point of general

19 deterrence.  I think there is a very long philosophical

20 conversation to be had about the wisdom of general deterrence;

21 however, what I will say here is that a 15-year sentence is a

22 tremendously long sentence.

23          THE COURT:  Can I stop you and tell you sort of where

24 I'm living right now?  Because general deterrence is a factor,

25 but it's not what's really --

1          MR. SZEKELY:  Sure.

2          THE COURT:  -- causing me the greatest concern.

3          MR. SZEKELY:  Sure, Your Honor.

4          THE COURT:  The greatest concern I have is,

5     Mr. Evans, you're an exceptionally accomplished man in your own

6     right.  You've served our country well, and I thank you for

7     that.  You have also served in the last several hundred days

8     that you've been at CDF, the inmates there who can't talk for

9     themselves sometimes.  They are not equipped as you are.

10         I've read all of your diary.  I am particularly -- it's of

11    particular interest to me that we fix what is in my view an

12    inadequate detention facility, and you and others in a pretrial

13    setting should not be subject to no water, no heat in the

14    winter, no air conditioning in the summer, and the whole array

15    of, as you put it, subhuman conditions.  And we're working on

16    it.  Not fast enough.  I'm putting that to the side, though.

17    I'm taking it into account, no doubt.

18         However, the part that I'm missing in all of this is an

19    understanding for why in this way, either from a psychosexual

20    evaluation standpoint, from a "I've really grappled with this"

21    standpoint; "I've put enough thought" -- Mr. Evans, I'm talking

22    in your voice -- "enough thought as to what's happened to the

23    these children as I have the inmates with whom I've spent every

24    day the last several hundred days."

25         I don't find that coming through, and that's troubling to

1    me, because the offense conduct is truly stomach turning.  It's

2    petrifying.  And I just don't -- one, I don't have an adequate

3    explanation for why -- and you're not expected to provide one

4    if it's going to be harmful, no doubt; but two, when you say

5    going forward, I don't even have an understanding of how going

6    forward this is going to be remedied, because, three, there is

7    so little attention paid to the -- to these girls in the

8    submission.

9        You know, so if you can get right there for me, that would

10    be helpful.

11        MR. SZEKELY:  Certainly.  And, Your Honor, I know

12    that Mr. Evans is going to address some of that in his

13    allocution.

14        THE COURT:  Okay.

15        MR. SZEKELY:  What I can say is in the time that I

16    have spent with Mr. Evans, in the course of this case, you

17    know, he has -- it has -- he's extraordinarily remorseful, Your

18    Honor.

19        Part of what happened in this case and the reason the case

20    ultimately got us -- the reason the plea happened relatively so

21    late -- there is a lot that happened before Ms. Richman and I

22    entered the case, but part of what went on in this case is

23    essentially that Mr. Evans had an idea of who he was.  And I

24    think the Court has touched on some of that; who is he.  And

25    the conduct in this case was really so removed from who he

1  thought he was that it took him an extraordinarily long time, I

2  think, to grapple with it himself, but he's done it.

3      And I think what is clear is that, one, he's accepted

4  responsibility.  Number two, he's gone through this process of

5  how he's learning about this.

6      And the Court indicated, "But why this way?"  And I think

7  one thing that is clear from Ms. Berman Reavis' (phonetic)

8  report is that, essentially, it's almost like an individual who

9  begins a drug, and you get a high off of the first dose, and

10  it's a small dose.  And then every time it's more and more and

11  more and more, and each time you're trying to sort of feel what

12  you felt that first time.

13      And as Ms. Berman Reavis wrote on page 11 of her report,

14  the constant quest for stimulation, trauma-based reactions from

15  his painful past are intwined with the emotional difficulties

16  and related to his conduct as outlined in the current charges.

17          THE COURT:  And I read that and I accept it, but

18  there is a part of me that wonders what else.  Because the

19  government raises a good point.  There were lots of ways that

20  didn't involve children that Mr. Evans did and could -- they

21  are not healthy, but they didn't involve children to get that

22  thrill or to numb that pain.

23      And the problem that I have going forward is how do I

24  fashion a sentence that addresses that concern about protecting

25  the public and protecting young, vulnerable girls who -- there

1  is no -- you know, you're not disputing, and I don't expect you

2  to, that the advertisement was particularly targeted and

3  particularly vial.

4      So that's the part that --

5          MR. SZEKELY:  Understood, Your Honor.

6          THE COURT:  -- is driving me to consider this as more

7  serious than maybe, you know, the defense wishes me to.

8          MR. SZEKELY:  Certainly, Your Honor.  And I can raise

9  a few points for that.

10          THE COURT:  Okay.

11          MR. SZEKELY:  The first is prior to the conduct in

12  this case, Mr. Evans engaged in a series of, I think, sort of

13  risky sexual behaviors with adult women.  And just like he

14  began maybe playing $5 a hand of Black Jack until it kept

15  escalating, you have to sort of view this in the context of the

16  overall life he was living, which included sort of -- there is

17  a lot of things.

18      And, Your Honor, just so you know, there is a lot that

19  Mr. Evans hid from the world that is now out in the open in

20  front of many of the people he cares most about.  One of those

21  things was this history of extramarital sexual relations, and

22  that began with initially age-appropriate individuals; and when

23  that was enough, it went further and further along.  So that's

24  number one.

25      So there is sort of this line that I don't -- this is not

a case where an individual is collecting thousands upon
thousands of images of child pornography. And we see those all
the time in these cases where there is a very common fact
pattern. There is allegations of production. And then over
here there are a cast of images that are collected. And more
sadly, and I'm sure the government would say, those images are
not hard to find.

So there is no evidence in any of the devices seized by
the government and examined that there is this sort of hoarding
of other child pornography type images. So that's not here,
and I think that's important in terms of looking at it in the
future. Those images are readily available, and he hasn't
collected them then, and there is no indication that he will in
the future.

Another matter here is that Mr. Evans was traumatized as a
child. I think it's clear, and the government agrees with
that. And victims of trauma, part of the nature of trauma is
sometimes reenacting trauma, unfortunately, onto themselves and
sometimes onto others. And it's treatable.

And I think that in terms of public safety is what we're
talking about here. What can the Court do to make sure that
public safety is secured here, the first is -- and one thing I
want to add, there is no indication of threats in these cases.
A lot of times there are threats. There is further
distribution that adds to the harm. None of that is here.

1    So if we're looking to public safety, what can this

2  Court -- how can the Court be assured that Mr. Evans is

3  treatable?  Well, the first is that we provided the briefing

4  providing generally low recidivism rates in these cases,

5  especially after treatment.  Even if we were to factor in a

6  degree of underreporting of these offenses --

7        THE COURT:  And I guess -- and forgive me if I wasn't

8  totally keyed into this, but I didn't know whether those

9  statistics you were citing me were targeted to contact cases.

10 And what I mean is I do see as a horse of a different color

11 even collection cases where there is no contact.  There are

12 individuals who look at pictures and are mortified the fact

13 that the world learns about it but are not predisposed and do

14 not ever act on that.

15        MR. SZEKELY:  And if I can add something, Your Honor?

16        THE COURT:  Conversely, we have the converse here.

17 We don't have a lot of -- we don't have a ton of images, but we

18 have got someone who has earned the trust of 14-year olds to

19 not only send pictures of sexual activity but engage in sexual

20 activity.

21        MR. SZEKELY:  I've provided this briefing to other

22 members of this bench in the past, and sometimes it's different

23 variations based on the facts.  At the time we filed this

24 sentencing memorandum, we were, effectively, still disputing

25 with the government whether or not contact occurred.  Today

1    we've come in and we've effectively resolved that dispute.

2      I have read these studies. Not every single study, Your

3    Honor, but some of these studies have actually looked at

4    contact offenses and, surprisingly, the recidivism rate is

5    actually lower sometimes when you look at contact offenses.

6       THE COURT: Is that because the sentences are longer

7    and the person ages out of any sort of predilection? I'm

8    asking because I want to understand it, not because I'm trying

9    to be cute with you.

10       MR. SZEKELY: Correct, and I don't think it's

11    necessarily -- these are primarily studies of state sentences,

12    which tend to be lower than the federal sentences. I think

13    it's part of the individuals with the contact offenses are more

14    readily steered towards the treatment and are more closely

15    supervised once out in the community.

16      That brings me to another point I was going to raise

17    later, but let me jump ahead.

18       THE COURT: Okay.

19       MR. SZEKELY: Supervised release isn't -- and I don't

20    mean to suggest that the Court should treat it as such, but an

21    afterthought in sentencing; it's part of the sentence. *Gall*

22    recognizes it as a punishment, but it is an important

23    non-incarcerated part of the sentence. So in looking at

24    supervised release, we're looking at the sort of supervision

25    Mr. Evans will be under.

1    I don't know of a higher degree of supervision the U.S.

2  Probation Office engages in than individuals convicted of

3  offenses like this.

4      THE COURT:  And that's because we're not a decade

5  plus out, and I will be asking probation when the time comes to

6  actually recommend any other conditions that I can't think of

7  today, because it's going to be -- even if I were to go with

8  your recommendation, Mr. Szekely, we're at fifteen years.  Ten

9  years, twelve years from now there may be additional treatment

10  and/or monitoring modalities that we can't even think of right

11  now.

12      MR. SZEKELY:  And I --

13      THE COURT:  So I'm with you on that.  I think we're

14  talking the same language when it comes to supervised release.

15  It is a period of both, I think, corrective but also

16  rehabilitative opportunities.  I'm seeing it that way.

17      MR. SZEKELY:  And not just rehabilitative but an

18  opportunity for the Court to keep, through the probation

19  office, careful track of individuals who I will readily concede

20  the Court has a interest of knowing what they are doing.

21      THE COURT:  That's fair.

22      MR. SZEKELY:  And I don't think there is any

23  question, and Mr. Evans would agree that strong supervision is

24  appropriate.  Not just that, Your Honor.  I've done a lot of

25  these sentencings, and I know the Court has presided over a lot

1  of these cases, and when we have these kind of charges, I look

2  behind me and usually there is nobody back there.

3      And I think it speaks to the fact that we do have a

4  turnout today on behalf of Mr. Evans speaks to two things.  It

5  speaks to the positive aspects of his character, as the Court

6  has acknowledged, but also speaks to the fact that in a sense

7  each of these individuals, because they care about Mr. Evans

8  but also because they live in the community, they are almost

9  going to be eight different probation officers, and they are

10  going to make sure that Mr. Evans does what he needs to do.

11  They are going to make sure that not a drop of alcohol passes

12  through his lips, if that's what's appropriate.  They're going

13  to make sure he gets to his treatment appointments.  They are

14  going to make sure he's checking in with his probation officer.

15      In the pretrial setting, we routinely talk along with the

16  third-party custodians.  Is this person going to make sure that

17  you are following the rules and let your probation officer

18  know?  One of Mr. Evans' friends here today is a Baltimore

19  County Police Officer.  So these are people who are very

20  invested in not just Mr. Evans but in the well-being of their

21  community.  And they are going to be helping to make sure that

22  Mr. Evans does exactly what he is supposed to do.

23      Going back additionally to public safety, the Court can in

24  the Bureau of Prisons order and Mr. Evans has asked to

25  recommend the sex offender management program, sex offender

1   management treatment program, and the RDAP program.  Mr. Evans

2   is certainly not going to get a sentence reduction of a year

3   with these charges for going through the RDAP program, but he

4   is going to learn to develop coping mechanisms to make sure

5   that he doesn't reach for alcohol when life is hard when he

6   comes out.

7        And that's the sort of treatment, that language of the

8   substance abuse treatment can transfer over to the other

9   treatment he's going to get, which is a sex offender treatment

10  program.

11        THE COURT:  Can I ask you -- because it's been a

12  minute since I've really had to drill down on this in a prior

13  professional life.  You're recommending, you're actually asking

14  me to impose and put in the judgment the sex offender

15  management, as well as treatment program; is that right?

16        MR. SZEKELY:  That's correct.  And they are different

17  but related.

18        THE COURT:  Correct.

19        Does the Bureau of Prisons, though, still engage in the

20  same sort of proactive assessment and/or refer inmates for a

21  look-see as to whether they are sexually dangerous offenders?

22        MR. SZEKELY:  So I've spoken with my colleagues in

23  North Carolina who handle I think it's 3148, the civil

24  commitment.  So the process -- I haven't briefed it here, but

25  I'm happy to discuss it with the Court.  The process

1   effectively is anyone going in on a charge like this or anyone

2   with a charge like this in their past, as they reach their

3   release date, their presentence report, anything that's on file

4   is forwarded to a team in Butner.  So that goes to a team, the

5   Bureau of Prisons doctors at Butner, and they make an

6   appropriate -- they do a review and they make a recommendation

7   as to whether the government should proactively seek civil

8   commitment at the end of a sentence based on a concern of

9   future sexual dangerousness.

10       So at first I would argue -- and, frankly, I didn't brief

11  it here because I think it's extraordinarily unlikely Mr. Evans

12  would trigger that given --

13           THE COURT:  You're saying unlikely?

14           MR. SZEKELY:  I think it's unlikely he would be

15  recommended for - I think his condition is treatable, and I

16  think he's unlikely to engage in the sorts of behaviors that

17  would trigger that review.  The behaviors that would trigger

18  that review would be, for example, refusal so participate in

19  mental health or sexual treatment programs.  Triggers --

20  another thing that would trigger that would be apparently it's

21  pretty common that individuals will get clothing catalogues of

22  young children, essentially collect images of children in their

23  cells, in the mail, and things of that nature, a log.  And if

24  there is a determination that person is viewed to be sexually

25  dangerous, the government proceeds with a trial, and it's a

1   bench trial in front of a district judge in the Eastern

2   District of North Carolina, and it's by a clear and convincing

3   standard.  And the government is not always successful.

4        Frankly, I think that judges are sometimes reluctant to do

5   that, but there are certainly a number of people sitting

6   primarily in state institutions.  There is really no federal

7   facility to house individuals who have been deemed in that

8   fashion.  There are some at Butner.  Primarily they are

9   returned to their home state and housed in a facility in their

10  home state and they're periodically reviewed.

11       And if at some point they have undergone treatment

12  programs and re-evaluated, they can be conditionally released.

13       THE COURT:  I note it just because it seems like in

14  addition to an internal incentive to do it, if that process as

15  you described it still exists, there is also an external

16  incentive to participate fully in these programs, which could

17  only help to protect the public in the future and reduce the

18  risk of recidivism.

19       That's kind of where I was just trying to understand what

20  the incentives are inside as you describe them.

21       MR. SZEKELY:  And they exist, and not just that, I

22  think it's an important -- I think it's a public safety

23  backstop to the sentence imposed here, because if Mr. Evans is

24  deemed in that way, you know, he could be detained.  The law

25  permits indefinitely until he's no longer a danger.  I don't

1   think that's going to be the case here.

2       I think his conditions here are treatable.  I think not

3   just that they are treatable but that he wants it.  They could

4   offer Mr. Evans the best possible treatment options in the

5   world, and if Mr. Evans doesn't want it, it's not going to

6   work.  It's like anything.  You need to be a willing and open

7   participant, Your Honor.

8       And I can tell you that the Mr. Evans who I was appointed

9   to represent, I think almost exactly a year ago, and the

10  Mr. Evans sitting here today, he's a different person.

11      And I know everyone comes before the Court and they say,

12  Your Honor, I'm a changed man.  I'm not the person I was when I

13  got arrested.  Mr. Evans has shared the details of his life

14  with us, that we have now shared with the Court, that he has

15  never shared with anyone.  And it's been difficult.  And

16  certainly the role of the Federal Public Defender's Office is

17  not to act as a therapist for our clients.  Our role is to

18  represent our clients zealously in an adversarial criminal

19  proceeding.

20      But in large ways, as we've represented Mr. Evans, he has

21  through this process learned a tremendous bit -- tremendously

22  about himself.  He has learned that -- what has led him to make

23  certain choices in his life.  He has learned how to avoid them.

24      The CDF mental health situation there is not great.  If

25  you have a pre-existing diagnosis or come down with something

1 which is easily medicatable, sometimes you get the medication;

2 sometimes you won't.

3 In terms of any sort of meaningful cognitive behavioral

4 therapy or talk therapy or something you would really need to

5 start to understand yourself, Mr. Evans has largely done that

6 on his own. And through especially Ms. Sandman has spent

7 countless number of hours with him, as well as Ms. Richman and

8 I.

9 Mr. Evans has read every book he can read about addiction

10 and mental health. He's learning about these things. As he's

11 learning about these things, he's learning about himself. He's

12 learning how not to -- how not to do these things again, Your

13 Honor.

14 It's certainly true we did not get a report from a

15 Dr. Berlin (phonetic) or someone like that who says, well, I've

16 met with the defendant and he's not a pedophile. Frankly, I

17 think the report we've provided here I think is more helpful

18 because I think it goes more into the big picture of Mr. Evans,

19 because this conduct here shouldn't be viewed in isolation.

20 As the government said, there is all of this other risky

21 behavior out there. We need to look at this conduct within the

22 context of his entire life and how he ended up there. And it's

23 been a long, slow process, and in a way -- it's very tragic in

24 a way. Just as Mr. Evans sort of witnessed sort of his

25 mother's long, slow progress through life, unfortunately, until

1    she passed, Mr. Evans, though, hidden, is not as well-shown,

2    has been going through a similar sort of process in his own

3    life where his behavior has become more and more risky.  His

4    own mental health struggles have become more and more serious.

5        We saw in Ms. Berman Reavis' report statistics about the

6    children of extremely mentally ill people, especially those who

7    witness suicide attempts, how much it traumatizes them.

8    Mr. Evans has said himself, though he's never hurt himself,

9    there certainly have been times where he thought it would be

10   easier if he could get very sick and just die.

11       Mr. Evans doesn't want to die.  What Mr. Evans wants to do

12   is get well.  Mr. Evans wants to serve his sentence.  He wants

13   to get well, and he wants to return home and continue on with

14   his life as best he can.  And supervised release is an

15   important component of that.

16       He will receive the beginnings of treatment in the Bureau

17   of Prisons.  The sex offender management unit has some informal

18   treatment options that begin.  There is a more intensive

19   program as you get closer to the release date, which I think

20   intuitively makes sense because you want to get out and

21   continue on refresh into your community-based treatment.

22       But the one reason we asked for that sex offender

23   management unit is, frankly, safety; but another reason is so

24   that he can start to benefit from those group therapy sessions,

25   for example, that aren't part of the formal treatment program.

1    Anecdotally, I suspect the mental health treatment might

2  be somewhat better in those facilities because they are more

3  attuned to the needs of the individuals.  And we certainly want

4  Mr. Evans to get the mental health treatment that he needs.

5    If we take Mr. Evans and we treat the things within him

6  that need to be treated, the public can be secure.  He'll also

7  be older.  He's been detained now for 24 months, 25 months just

8  about.  He'll be in his mid-40s at the time the sentence is

9  done.

10    THE COURT:  Watch it, Mr. Szekely.  That is very

11  young.

12    MR. SZEKELY:  Of course, Your Honor, yes.  I'm headed

13  there myself.

14    THE COURT:  You have a lot of life left, Mr. Evans.

15    MR. SZEKELY:  And I think that that is exactly what

16  we're saying.  Mr. Evans wants to have a lot of life left, and

17  he's going to do the things he needs to do to get there.  He

18  doesn't just want life.  He wants a good, meaningful life with

19  the people he cares about.

20    He's extremely remorseful.  He's expressed his remorse to

21  us, to his father in his letter.  He's going to express it

22  again here today, Your Honor.

23    Your Honor, I think the Court can look at where we were,

24  that Mr. Evans had left some factual matters open, and we've,

25  over time, resolved those.  I think that's not without meaning

1  in this process in terms of Mr. Evans' understanding of what

2  this process is about and what he needs to do with himself to

3  get better.

4        THE COURT:  Well, I see it as, no doubt, I mean,

5  mitigating because without it, you have to take the family

6  through it.  You have to take the government through it.

7  Whether it's restitution or challenging the victim's conduct,

8  the victim's recitation of the conduct, challenging the

9  evidence, all of which just burns the resources of the

10  government, but it also just prolongs the -- I think the

11  injury.

12       So I do note that Mr. Evans has, with the assistance of

13  your office, really focused on what's most relevant to the

14  Court, and I appreciate that.

15       MR. SZEKELY:  Thank you, Your Honor.

16       And just to sort of wrap up the public safety portion of

17  it, the Court has a lot of tools at its disposal.  I would

18  suggest that additional incarceration is, perhaps, the bluntest

19  tool, and I think there are undoubtedly cases where it's just

20  clear that there is nothing to be done, and this is an

21  individual who simply needs to be not in the community.  There

22  is no other way to protect the community except to take this

23  person out of it for a long time.

24       Fifteen years, number one, is a very long time.  It is a

25  substantial sentence.

1       And number two, Mr. Evans is not such an individual.  He's

2   treatable.  There is, as we said, the backstop of civil

3   commitment.  There is -- Mr. Evans is as motivated as any

4   client I've ever met with to participate in these treatment

5   programs, but there is the additional incentive of if you do

6   the treatment program, the government is not as likely to

7   detain you because you've done what the government views as the

8   appropriate steps to take to not be a dangerous individual upon

9   your release.

10       So for those reasons, Your Honor, I do believe a 15-year

11  sentence in this case is appropriate.

12       And if I can talk a little bit more about supervised

13  release and why I believe supervised release -- it could be a

14  meaningful part of the sentence in this case that also

15  addresses public safety.  Mr. Evans, in a structured

16  environment, Mr. Evans follows the rules to a T.  He had an

17  excellent military career.  He's been at CDF --

18       THE COURT:  That cuts both ways.  I mean, he was

19  gainfully employed in all of those ways and put on a very

20  public persona that suggested discipline and order, and yet

21  there are five children who were contacted directly or

22  indirectly for sex, for sex for money.  So I hear you, but that

23  is of limited value in my opinion, because it -- so anyway, I

24  didn't mean to interrupt you, but I did because I want you to

25  be able to address this notion that I have an individual who

1  knows how to follow rules, has been -- he's decorated from the

2  military because of that.  He can take -- you know, he can

3  convince folks that he's quite the leader.  But he can also,

4  you know, convince children to do terrible things.

5          MR. SZEKELY:  Well, he wasn't on supervised release.

6  He wasn't having his computer use monitored.

7          THE COURT:  So there is not going to be any objection

8  to those recommended conditions of supervised release?

9          MR. SZEKELY:  There is nothing the probation office

10  has recommended in this case in terms of supervised release

11  that we object to.  That's correct.  We think given the conduct

12  in this case, given Mr. Evans' need for ongoing treatment, we

13  think those are all reasonable and appropriate, and I think we

14  would have no objection to the Court making the necessary

15  findings under the statute that those are appropriate

16  conditions of supervised release tailored specifically to

17  Mr. Evans.

18          THE COURT:  Okay.

19          MR. SZEKELY:  So he's going to be monitored, and

20  Mr. Evans was on pretrial release in Montgomery County for

21  several months before his federal arrest.  We've attached those

22  records to the sentencing memo.  He reported twice a week,

23  traveling from Baltimore County to -- I'm sorry, Mr. Evans, was

24  it Gaithersburg or Rockville that you had to travel to?

25          THE DEFENDANT:  It was Rockville.

1          MR. SZEKELY:  Going there to Rockville twice a week

2    as required in compliance.  The only infraction -- I'll put

3    that in quotes is -- he had a GPS violation when the marshals

4    here cut his ankle bracelet off when he was taken into custody.

5    So he has a track record.

6          So I understand, Your Honor, it's a small slice in time

7    compared to the term of supervised release we're talking about

8    here, but I think that it's meaningful to show that he can, in

9    fact, comply with those requirements while he's on release.

10          So unless -- Court's indulgence.

11          (Brief pause.)

12          MR. SZEKELY:  Your Honor, unless there is anything

13    else the Court wishes to discuss, I know that -- I'm happy to

14    answer any questions the Court may have.  I know that Mr. Evans

15    has prepared an allocution.  I know that he wants to share it

16    with the Court, and I have the -- our sentencing recommendation

17    as to facilities, but I can do that at the end or now, whatever

18    the Court prefers.

19          THE COURT:  All right, that's fine.

20          I just want to see if Mr. Hagan has anything to add with

21    respect to the fact that Mr. Evans will be very closely watched

22    while he's in -- for his term of incarceration.  He will be

23    subject, if there is any concern to his particular -- concern

24    with respect to the likelihood that he will re-offend and

25    re-offend in this way, that the government does have now a

1   quite well-established program where anyone can be brought

2   before a civil -- a judge for a civil commitment, which I find

3   to be -- I think this may be the only kind of offense that

4   triggers that kind of scrutiny, meaning set of offenses, set of

5   conduct.

6      Do you have anything to add in that respect or anything

7   else that you wish for me to consider in that regard?

8         MR. HAGAN:  No.  Thank you, though.  Thank you for

9   consulting, Your Honor.  No.

10        THE COURT:  All right, thank you.

11     Mr. Evans, we've been talking for quite some time about

12   very difficult things for everyone, not only you, but for the

13   victims involved in this case and their families.  I understand

14   from your counsel that you may wish to speak to me now.  You

15   don't have to.  You have the absolute right to remain silent.

16   I have read your statement.  I will not hold your silence

17   against you, but if there is anything that you wish for me to

18   know before I impose sentence, then now would be the time.

19        THE DEFENDANT:  I would like to speak, Your Honor.

20        THE COURT:  Okay.  And you can stay seated or stand,

21   whatever is most comfortable.

22        THE DEFENDANT:  Your Honor, Thank you for allowing me

23   the opportunity to speak.  As I have not spoken publicly in

24   quite some time, I hope that you do not mind that I read from

25   my notes.

I would first like to say that everything I wrote in my letter to you was genuine. Writing everything out like that made me realize even more that I've been through a lot. I've experienced many traumatic events in my lifetime, but it wasn't until most recently that I knew how they truly affected me as a person.

During my two plus years in detention, I've educated myself on those events which I have -- which has enabled my recovery and healing process to begin.

I would like to apologize to my friends and family for everything that I put them through over the last few years and also thank those who have stuck by me through everything. I would also like to thank my entire defense team for all of their hard work.

Lastly, I would like to sincerely apologize to anyone that I have hurt or victimized throughout the course of my entire life, and especially to those related to these most recent events. I hope in time that I can be forgiving. If not, then I hope that you can understand that I have never intended to harm anyone ever in my life, and this situation has taught me many valuable lessons that I will never forget.

I hope that I will have the opportunity to once again become a productive member of society. I believe through my education and experience that I can help many others overcome what I was unable to overcome by myself.

1     I realize that I need the help of others to survive in
2 this world, and some day I would like to be that help for
3 someone in need so that I may help to save their life, just as
4 so many others have helped to save mine.
5     Thank you for your time and patience.
6         THE COURT:  Thank you, Mr. Evans.
7     (Conference at the Bench.)
8     It is the policy of this Court that every guilty plea and
9 sentencing proceeding include a bench conference concerning
10 whether the defendant is or is not cooperating.
11     (Open court.)
12        THE COURT:  Mr. Evans, one of my deepest concerns for
13 you -- and this may not be wholly fair, but it is still the
14 deepest concern I have is that this process of really
15 understanding the nature of your crime -- and it's a crime --
16 is not -- it's just beginning, that there is going to have to
17 be many years of really reconciling with the fact that it's not
18 just anyone who was involved.  They are not adults.  They are
19 babies.  I know that -- for you not having -- not being a
20 parent yet, it's -- I think it may hit you differently if and
21 when you do become a parent.
22     But children at that age are so much more children than
23 they are adults, and there is no other word for what happened.
24 You preyed on their vulnerabilities, and I understand that you
25 were once a child too and went through some horrible, horrible

1  things and saw things that I'm glad you can now talk about,

2  because that is the only way that you're ever one day going to

3  really look in the eye -- look yourself in the eye and be

4  honest, fully honest about how serious this offense was.

5      It's my greatest hope for you, because you do have

6  support, you have -- there is a lot of love in this room for

7  you, and you do have a resilience, both your brain as well as

8  your heart, that you're going to be able to dive right into the

9  therapy that you need so that maybe when I see you again, the

10  conversation is going to be different, because I don't believe

11  you have fully come to terms with just the gravity of what

12  you've done.

13      So I have to take it all into consideration.  If I were

14  just looking at protecting the public or the seriousness of the

15  offense, I would be imposing every bit of what the government

16  is asking for.  If I were just looking at getting you home and

17  in a place that is most close to your loved ones, I would be

18  weighing against the mandatory minimum.  I have to take it all

19  into account.

20      There are five victims as I see it.  One whom there was a

21  longstanding relationship that has forever scarred her and

22  likely forever scarred you; and then there is a whole range in

23  between of sex for money with children; requests for it in

24  treatises when no one is looking because you obviously have too

25  much pride and concern for your family and conscience that you

1   wouldn't do that in open, in public.

2       I am comforted by the fact that you will be on

3   supervision, and I will impose lifetime supervision, at least

4   initially, because I expect to be here when you are released,

5   when you are on supervision, and I expect to be hearing

6   affirmatively and proactively how you're doing.  I can always

7   reconsider bringing that down if you are doing well and you are

8   in compliance.  And hopefully you've already heard, I do that

9   very actively, especially in cases like this.  I do not shy

10  away from inviting you to tell me the good and the bad and the

11  in between of supervision.

12      I'm also comforted -- and I know our probation office is

13  quite good at it, and they will only get better with technology

14  and with education by the time you are on supervised release.

15  My hope is that the system that will be in place will be far

16  better calibrated and that not only helps you but it reduces

17  the chances that this will ever happen again, and in that way

18  it does protect the public.

19      I'm also heartened to hear that there is still a program

20  by which if the government is concerned while you are

21  incarcerated that you are not living up to the promises you've

22  made through counsel of really drilling down on your

23  rehabilitation, and if they are concerned that you are one of

24  the handful of folks -- and I can't know that with certainty.

25  Nobody can -- one of the handful of folks that the government

1  views as so dangerous that longer than an incarcerable term

2  that I'm considering is on the -- up for consideration, they

3  can so move.

4      That gives me comfort, because today isn't the end of the

5  protect the public piece, which is why I'm not going to do what

6  the government requests.  I'm not going to do near what the

7  government requests, but I am not going to impose the mandatory

8  minimum.

9      In my view, the mandatory minimum is for a single offense

10  with a single victim and, perhaps, single production, and we

11  don't have that here; but I do take to heart that my mandate is

12  sufficient but not one day greater than necessary.  I'm very

13  aware that at some point too much incarceration actually works

14  the opposite.

15      So therein is my struggle, which is your struggle, and the

16  sentence of the Court will be 204 months custody of the Bureau

17  of Prisons.  That's 17 years.  You will be -- get credit for

18  every day that you have served.  And as I mentioned to you

19  earlier, I have already in my view credited that your time in

20  pretrial detention has not only been very difficult, but it has

21  been one in which you have gone above and beyond for others.

22  And not everybody that comes here -- everybody tells me how bad

23  it is, and I try to take it into account every time, but not

24  everybody comes forward and says that they have tried to help

25  others, and I do credit all of that.

1    I also note you have significant family support and that,

2  in my view, warrants a sentence that is not only lower than the

3  guidelines but lower than what the government requests.

4    You will then serve supervision for the rest of your life,

5  and in addition to the standard conditions, I will require that

6  you comply with the Sex Offender Registration Notification Act

7  as directed by the probation officer, the Bureau of Prisons, or

8  any state sex offender registration agency where you reside,

9  work, is a student.

10   You will also participate, upon your release, in a sex

11  offender specific assessment and in a treatment program that's

12  deemed appropriate by the probation office.

13   The probation officer will install computer monitoring

14  software on any computer that you use, whatever devices that

15  may be, phone, strange things that we invent between now and

16  when you are on supervision, and computers.

17   You will be giving probation, at least in the beginning

18  phase of your supervision, the authority to conduct initial and

19  periodic unannounced searches of any devices that are capable

20  of acting like a computer; and these are for the purposes of

21  determining whether there is any prohibited data, whether that

22  be images or conversations with anyone who appears to be a

23  minor.  And I expect to learn if there is anything, obviously,

24  immediately.

25   You must warn any and all other people who may be using

1  those computers or devices that they may be subject to this

2  unannounced search.

3      I'm not going to impose a fine.

4      Is there an agreed upon restitution amount?

5          MR. HAGAN:  Your Honor, none is sought by the

6  government.  We have reached out repeatedly, and at this stage

7  we don't have a number to submit.

8          THE COURT:  Okay.  So there is no restitution.

9      There is a special assessment for five counts -- have I

10 got that right -- so a $500 special assessment.  That will be

11 due and payable during supervision.  I'm not going to make you

12 part of the Inmate Financial Responsibility Program.  My hope

13 is that you devote all of your energies to the treatment

14 programs that I will recommend as outlined by your counsel.

15     Is there any particular facility that you wish for me to

16 recommend?

17         MR. SZEKELY:  There is, Your Honor.  We've reviewed

18 programming facilities with Mr. Evans.  We request FCI

19 Petersburg low.  I believe, subject to the Bureau of Prisons'

20 procedures, I believe the sentence the Court is imposing today

21 would qualify him for placement in a low facility.  And it has

22 both an RDAP and a sex offender management unit there.

23         THE COURT:  It does?  Okay.

24         MR. SZEKELY:  So we would ask that he be housed in a

25 sex offender management unit, recommend him for a sex offender

treatment program, and participation in RDAP and any other
mental health treatment the Bureau of Prisons finds
appropriate. And I'll talk with Ms. Blanche regarding sending
these reports through the "e" designated system so that mental
health staff there is made aware of Mr. Evans' needs prior to
his arrival.

THE COURT: Okay.

And, Mr. Szekely, if you would also confer with
Mr. Ulander to make sure that the language in the judgment is
as well-crafted as possible to maximize the chances --
Mr. Evans, I can't guarantee that you will receive FCI
Petersburg low. I do note it's closest or er to your family,
and I would encourage your family to stay very active in your
life, and I encourage you to keep letting them in. So I do
believe it is appropriate to try to get you as close to them as
possible.

So whatever you wish to tinker with that language and then
I'll review it, Mr. Szekely.

MR. SZEKELY: Will do, Your Honor. Thank you.

And the last thing, I will note that Mr. Evans has been in
continual federal pretrial incarceration since April -- I'm
sorry, August 23, 2016.

THE COURT: Okay. So there is no dispute that he'll
be receiving credit for those days. If you learn otherwise,
let me know, but those days should be absolutely credited.

1         MR. SZEKELY:  They should be credited under 3585.

2  Thank you.

3         THE COURT:  Any other aspect of the sentence that I

4  have failed to address?

5         MS. BLANCHE:  To be clear, Count Two carries a

6  maximum of 120 months.  Would that be the sentence for Count

7  Two and --

8         THE COURT:  Yes, correct.  So Count Two -- you're

9  right.  You're right, that will be concurrent.  And the

10  supervised release is obviously concurrent.

11     Okay, anything else?  Are there any counts to dismiss?

12         MR. SZEKELY:  Your Honor, if I can take a -- while

13  he's dismissing counts, if I may take one look at something,

14  Your Honor?

15         THE COURT:  Sure.

16     Mr. Hagan, do you have counts to dismiss?

17         MR. HAGAN:  I do, Your Honor.  We're also looking at

18  the special assessment.

19         MR. SZEKELY:  Your Honor, I think Mr. Hagan -- there

20  is a special $5,000 special assessment that can be made due in

21  these cases.  The statute permits it to be waived in the case

22  of indigency.  I would ask the Court to make a finding of

23  indigency and not require -- I don't know if that is what

24  Mr. Hagan was about to say, but to not make that payable in

25  this case.

1          THE COURT:  I note that the presentence report shows

2    negative net worth, negative monthly cash flow.  Mr. Evans will

3    not be gainfully employed with a reasonable wage for quite some

4    time.  I'm going to find -- make that finding of indigency.

5          MR. HAGAN:  Thank you, Your Honor.

6       The government would move to dismiss Counts One, as well

7    as Count Seven through I believe it's Fourteen.

8          THE COURT:  Okay.

9          MR. HAGAN:  Oh, and -- yes, thank you.  This was a

10   Superseding Indictment, Your Honor.  So the government would

11   also move to dismiss the original indictment.

12         THE COURT:  Okay.  All right.  Granted.

13      All right, Mr. Evans, you may or may not have given up

14   your right to appeal my sentence.  I don't recall from your

15   agreement.  So please speak with your counsel as soon as

16   possible, because if you disagree with my sentence, you have to

17   note your appeal within 14 days.  Okay?

18      I otherwise wish you the best of luck.  Please let me know

19   how you're doing at every turn.  You write me about whatever

20   program you've completed, and you tell me how you're doing.

21   I'm beginning to announce this to you all.  I will write you

22   back.  I will give you the -- I will give you whatever words of

23   encouragement that my pen on a paper can give you in the hopes

24   that it -- at the end of the day, works to make sure we're

25   never back here, except for good news with you.  Okay?

1          THE DEFENDANT:  Thank you, Your Honor.

2          THE COURT:  All right, thank you all.  Have a good

3    day.

4          THE DEPUTY CLERK:  All rise.

5       This Honorable Court now stands in recess.

6       (Recess taken, 1:25 P.M.)

7

8       I, Marlene Martin-Kerr, FCRR, RPR, CRR, RMR, certify that

9    the foregoing is a correct transcript of the stenographic

10   record of proceedings in the above-entitled matter.

11

12                    Dated this 27th day of February, 2019.

13
                                    /s/
14                    _____
                           Marlene Martin-Kerr
15                      Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**$**

**$5,000** [1] - 57:20
**$500** [1] - 55:10

**/**

**/s** [1] - 59:13

**1**

**1** [23] - 1:10, 10:9, 10:17, 10:19, 11:8, 12:4, 12:7, 15:13, 15:18, 15:21, 16:4, 17:4, 17:7, 18:2, 18:6, 18:23, 19:10, 19:17, 22:4, 22:18, 22:24, 26:19
**100** [1] - 1:19
**11** [1] - 30:13
**118** [1] - 5:24
**120** [1] - 57:6
**12:00** [1] - 1:10
**14** [4] - 10:22, 25:25, 58:17
**14-year** [2] - 19:20, 33:18
**15** [4] - 7:23, 21:4, 25:17, 25:25
**15-year** [3] - 21:11, 27:21, 45:10
**16** [3] - 20:11, 20:21, 25:25
**17** [2] - 23:9, 53:17
**17-year-old** [1] - 26:1
**18th** [2] - 18:20
**1:25** [1] - 59:6

**2**

**2** [2] - 20:1, 22:10
**200** [2] - 1:14, 1:24
**2001** [1] - 10:21
**2015** [4] - 10:9, 20:11, 20:21, 21:1
**2016** [3] - 18:20, 21:1, 56:22
**2018** [1] - 1:10
**2019** [1] - 59:12
**204** [1] - 53:16
**20770** [2] - 1:15, 1:24
**20s** [1] - 11:16
**21201** [1] - 1:19
**23** [1] - 56:22
**24** [1] - 43:7
**25** [1] - 43:7
**27th** [1] - 59:12

**3**

**3** [7] - 20:1, 20:20, 22:10, 22:25, 23:6, 23:7, 23:14
**30-year** [1] - 26:8
**301** [2] - 1:15, 1:25
**3148** [1] - 37:23
**344-3499** [1] - 1:25
**344-4516** [1] - 1:15
**3553** [2] - 7:22, 16:19
**3553(a** [5] - 5:7, 9:23, 21:2, 23:16, 26:6
**3585** [1] - 57:1
**360** [1] - 21:6

**4**

**4** [1] - 17:18
**410** [1] - 1:20
**43** [2] - 7:5, 7:12
**46** [1] - 7:5
**4685** [1] - 18:24
**4697** [1] - 19:16
**4703** [1] - 22:4

**5**

**5** [1] - 31:14

**6**

**6500** [2] - 1:14, 1:24

**9**

**900** [1] - 1:19
**95** [1] - 20:18
**962-3962** [1] - 1:20

**A**

**ability** [1] - 11:25
**able** [8] - 6:19, 11:23, 17:19, 18:14, 18:15, 24:2, 45:25, 51:8
**above-entitled** [1] - 59:10
**absolute** [1] - 48:15
**absolutely** [3] - 10:1, 17:3, 56:25
**abuse** [3] - 10:24, 11:2, 37:8
**abused** [1] - 17:10
**accept** [1] - 30:17
**accepted** [1] - 30:3
**access** [2] - 19:20, 23:20
**accomplished** [1] -
28:5
**account** [4] - 20:5, 28:17, 51:19, 53:23
**accountability** [1] - 25:16
**accurate** [1] - 14:11
**acknowledge** [1] - 4:23
**acknowledged** [1] - 36:6
**act** [2] - 33:14, 40:17
**Act** [1] - 54:6
**acting** [1] - 54:20
**active** [1] - 56:13
**actively** [1] - 52:9
**activity** [2] - 33:19, 33:20
**acts** [1] - 13:1
**ad** [2] - 17:14, 24:3
**add** [5] - 3:9, 32:23, 33:15, 47:20, 48:6
**added** [1] - 6:8
**addiction** [1] - 41:9
**addition** [4] - 3:24, 5:14, 39:14, 54:5
**additional** [8] - 4:1, 5:16, 6:7, 6:12, 9:24, 35:9, 44:18, 45:5
**additionally** [3] - 3:1, 4:7, 36:23
**additions** [2] - 6:3, 6:22
**address** [5] - 3:16, 27:17, 29:12, 45:25, 57:4
**addresses** [2] - 30:24, 45:15
**adds** [1] - 32:25
**adequate** [2] - 23:17, 29:2
**admitted** [1] - 14:15
**adopted** [1] - 15:18
**adult** [4] - 17:1, 19:22, 21:16, 31:13
**adults** [2] - 50:18, 50:23
**advance** [1] - 6:1
**advantage** [1] - 26:18
**adversarial** [1] - 40:18
**advertisement** [1] - 31:2
**advertisements** [2] - 10:13, 22:8
**affected** [1] - 49:5
**affirmatively** [1] - 52:6
**afford** [1] - 23:17
**afternoon** [4] - 2:7, 2:12, 2:14, 2:15
**afterthought** [1] - 34:21
**age** [4] - 10:21, 17:17, 31:22, 50:22
**age-appropriate** [1] - 31:22
**agency** [1] - 54:8
**Agent** [2] - 2:13, 5:5
**ages** [1] - 34:7
**ago** [4] - 8:11, 10:4, 24:13, 40:9
**agree** [2] - 9:22, 35:23
**agreed** [1] - 55:4
**agreeing** [1] - 15:8
**agreement** [3] - 7:4, 7:12, 58:15
**agrees** [1] - 32:16
**ahead** [1] - 34:17
**Aided** [1] - 1:21
**air** [1] - 28:14
**alcohol** [2] - 36:11, 37:5
**allegations** [1] - 32:4
**allocution** [2] - 29:13, 47:15
**allowing** [1] - 48:22
**alluded** [1] - 24:12
**almost** [4] - 3:4, 30:8, 36:8, 40:9
**AMERICA** [1] - 1:3
**amount** [2] - 25:13, 55:4
**analysis** [2] - 5:18, 7:22
**ANDREW** [1] - 1:18
**Andrew** [1] - 2:15
**anecdotally** [1] - 43:1
**anger** [1] - 16:25
**ankle** [1] - 47:4
**announce** [1] - 58:21
**answer** [3] - 16:15, 17:15, 47:14
**anyway** [1] - 45:23
**apologize** [4] - 13:11, 14:1, 49:10, 49:15
**apparent** [1] - 14:6
**appeal** [2] - 58:14, 58:17
**appointed** [1] - 40:8
**appointments** [1] - 36:13
**appreciate** [3] - 16:20, 16:21, 44:14
**appreciated** [1] - 17:4
**appropriate** [16] - 6:19, 24:24, 26:7, 26:9, 26:24, 31:22, 35:24, 36:12, 36:8, 45:8, 45:11, 46:13, 46:15, 54:12, 56:3, 56:15
**approval** [1] - 5:6
**April** [3] - 21:1, 56:21
**area** [3] - 10:17, 20:14, 22:13
**areas** [2] - 14:13, 18:9
**argue** [1] - 38:10
**argued** [1] - 20:12
**arguing** [1] - 23:12
**arguments** [1] - 23:2
**armed** [1] - 15:1
**arrangement** [1] - 5:6
**array** [1] - 28:14
**arrest** [1] - 46:21
**arrested** [1] - 40:13
**arrival** [1] - 56:6
**ashamed** [1] - 16:25
**aspect** [2] - 24:11, 57:3
**aspects** [2] - 27:5, 36:5
**assault** [1] - 17:2
**assessment** [6] - 37:20, 54:11, 55:9, 55:10, 57:18, 57:20
**assistance** [1] - 44:12
**associated** [1] - 7:23
**assured** [1] - 33:2
**attach** [1] - 6:14
**attached** [1] - 46:21
**attempts** [1] - 42:7
**attention** [1] - 29:7
**ATTORNEY** [1] - 1:13
**attuned** [1] - 43:3
**August** [1] - 56:22
**authority** [1] - 54:18
**available** [2] - 23:20, 32:12
**avoid** [1] - 40:23
**aware** [3] - 16:5, 53:13, 56:5

**B**

**babies** [1] - 50:19
**background** [1] - 10:23
**backstop** [2] - 39:23, 45:2
**bad** [2] - 52:10, 53:22
**BALTIMORE** [1] - 1:3
**Baltimore** [4] - 20:17, 22:12, 36:18, 46:23
**based** [9] - 4:20, 9:23, 19:1, 24:20, 25:19, 30:14, 33:23, 38:8, 42:21
**Bates** [2] - 18:23, 19:16
**become** [4] - 42:3, 42:4, 49:23, 50:21

**BEFORE** [1] - 1:9
**began** [3] - 10:17, 31:14, 31:22
**begin** [6] - 12:3, 12:7, 12:8, 24:2, 42:18, 49:9
**beginning** [3] - 50:16, 54:17, 58:21
**beginnings** [1] - 42:16
**begins** [1] - 30:9
**behalf** [3] - 2:11, 2:16, 36:4
**behavior** [3] - 25:9, 41:21, 42:3
**behavioral** [1] - 41:3
**behaviors** [4] - 26:2, 31:13, 38:16, 38:17
**behind** [1] - 36:2
**believes** [1] - 12:16
**Bench** [1] - 50:7
**bench** [3] - 33:22, 39:1, 50:9
**benefit** [1] - 42:24
**Berlin** [1] - 41:15
**Berman** [3] - 30:7, 30:13, 42:5
**best** [3] - 40:4, 42:14, 58:18
**betrayal** [1] - 12:18
**better** [8] - 17:17, 18:18, 23:15, 26:21, 43:2, 44:3, 52:13, 52:16
**between** [5] - 13:6, 21:1, 51:23, 52:11, 54:15
**beyond** [1] - 53:21
**big** [2] - 26:4, 41:18
**bill** [2] - 20:5, 20:6
**binder** [3] - 4:14, 4:19, 5:14
**bit** [9] - 10:2, 12:4, 15:2, 19:1, 22:24, 27:10, 40:21, 45:12, 51:15
**Black** [1] - 31:14
**blanche** [4] - 6:17, 7:16, 56:3
**BLANCHE** [2] - 7:20, 57:5
**bluntest** [1] - 44:18
**book** [1] - 41:9
**born** [1] - 10:21
**bottom** [1] - 11:18
**box** [1] - 25:19
**boxes** [1] - 19:16
**boyfriend** [3] - 10:25, 12:17, 17:9
**bracelet** [1] - 47:4
**Bradley** [1] - 2:22

**brain** [1] - 51:7
**breakup** [2] - 15:22, 17:6
**Brief** [1] - 13:14, 13:23, 47:11
**brief** [2] - 13:20, 38:10
**briefed** [1] - 37:24
**briefing** [2] - 33:3, 33:21
**bring** [1] - 27:16
**bringing** [2] - 8:15, 52:7
**brings** [1] - 34:16
**brought** [1] - 48:1
**bulk** [1] - 19:10
**burdens** [1] - 15:6
**Bureau** [8] - 36:24, 37:19, 38:5, 42:16, 53:16, 54:7, 55:19, 56:2
**burns** [1] - 44:9
**bus** [2] - 22:11, 22:15
**business** [2] - 16:15, 16:16
**Butner** [3] - 38:4, 38:5, 39:8
**BY** [2] - 1:14, 1:18

## C

**calibrated** [1] - 52:16
**candidly** [1] - 12:16
**capable** [1] - 54:19
**car** [2] - 18:18, 22:15
**care** [1] - 36:7
**cared** [1] - 17:23
**career** [1] - 45:17
**careful** [1] - 35:19
**cares** [3] - 19:7, 31:20, 43:19
**Carlson** [2] - 2:13, 5:5
**Carolina** [2] - 37:23, 39:2
**carries** [2] - 21:10, 57:5
**case** [27] - 2:8, 3:5, 14:5, 15:17, 17:3, 17:21, 23:21, 23:22, 24:19, 25:8, 26:2, 29:16, 29:19, 29:22, 29:25, 31:12, 32:1, 40:1, 45:11, 45:14, 46:10, 46:12, 48:13, 57:21, 57:25
**CASE** [1] - 1:4
**cases** [9] - 32:3, 32:23, 33:4, 33:9, 33:11, 36:1, 44:19, 52:9, 57:21
**cash** [1] - 58:2

**cast** [4] - 17:12, 22:17, 26:16, 32:5
**casting** [1] - 10:12
**catalogues** [1] - 38:21
**caught** [2] - 19:17, 25:3
**caused** [1] - 23:13
**causing** [1] - 28:2
**CDF** [3] - 28:8, 40:24, 45:17
**cells** [1] - 38:23
**certain** [1] - 40:23
**certainly** [10] - 7:20, 15:10, 29:11, 31:8, 37:2, 39:5, 40:16, 41:14, 42:9, 43:3
**certainty** [1] - 52:24
**certify** [1] - 59:8
**cetera** [4] - 10:14, 11:10, 14:8, 24:21
**challenged** [1] - 3:22
**challenging** [2] - 44:7, 44:8
**champion** [1] - 11:5
**chance** [2] - 23:1, 25:4
**chances** [2] - 52:17, 56:10
**changed** [1] - 40:12
**changes** [2] - 6:4, 6:22
**character** [1] - 36:5
**charge** [2] - 38:1, 38:2
**charged** [1] - 15:17
**charges** [3] - 30:16, 36:1, 37:3
**CHARLES** [1] - 1:19
**chat** [1] - 12:7
**chats** [3] - 12:5, 17:25, 19:21
**Chats** [1] - 12:6
**checking** [1] - 36:14
**CHERRYWOOD** [2] - 1:14, 1:24
**child** [9] - 11:8, 11:22, 16:13, 16:20, 21:20, 32:2, 32:10, 32:16, 50:25
**children** [17] - 14:25, 17:15, 24:2, 25:14, 25:23, 26:5, 28:23, 30:20, 30:21, 38:22, 42:6, 45:21, 46:4, 50:22, 51:23
**choices** [1] - 40:23
**chose** [2] - 23:19, 25:22
**Christine** [1] - 2:13
**Cindy** [1] - 2:24
**circumstances** [3] - 10:7, 16:18, 18:5

**citing** [1] - 33:9
**civil** [5] - 37:23, 38:7, 45:2, 48:2
**clarified** [1] - 7:2
**clear** [9] - 12:6, 12:9, 22:19, 30:3, 30:7, 32:16, 39:2, 44:20, 57:5
**CLERK** [2] - 2:3, 59:4
**client** [1] - 45:4
**clients** [2] - 40:17, 40:18
**close** [2] - 51:17, 56:15
**closely** [2] - 34:14, 47:21
**closer** [1] - 42:19
**closest** [1] - 56:12
**clothing** [1] - 38:21
**cognitive** [1] - 41:3
**colleagues** [1] - 37:22
**collect** [1] - 38:22
**collected** [2] - 32:5, 32:13
**collecting** [1] - 32:1
**collection** [1] - 33:11
**color** [1] - 33:10
**comfort** [1] - 53:4
**comfortable** [2] - 14:6, 48:21
**comforted** [2] - 52:2, 52:12
**coming** [7] - 9:9, 13:9, 22:12, 22:13, 28:25
**commitment** [4] - 37:24, 38:8, 45:3, 48:2
**committing** [1] - 11:1
**common** [2] - 32:3, 38:21
**communicating** [2] - 19:18, 19:21
**communications** [2] - 24:5, 24:15
**community** [7] - 26:15, 34:15, 36:8, 36:21, 42:21, 44:21, 44:22
**community-based** [1] - 42:21
**compared** [1] - 47:7
**completed** [1] - 58:20
**compliance** [2] - 47:2, 52:8
**compliments** [1] - 24:5
**comply** [2] - 47:9, 54:6
**component** [1] - 42:15
**compromised** [1] - 11:25

**computer** [4] - 46:6, 54:13, 54:14, 54:20
**Computer** [1] - 1:21
**Computer-Aided** [1] - 1:21
**computers** [2] - 54:16, 55:1
**concede** [1] - 35:19
**concern** [10] - 19:2, 19:9, 28:2, 28:4, 30:24, 38:8, 47:23, 50:14, 51:25
**concerned** [2] - 52:20, 52:23
**concerning** [1] - 50:9
**concerns** [1] - 50:12
**concurrent** [2] - 57:9, 57:10
**condition** [1] - 38:15
**conditionally** [1] - 39:12
**conditioning** [1] - 28:14
**conditions** [8] - 21:7, 26:11, 28:15, 35:6, 40:2, 46:8, 46:16, 54:5
**conduct** [28] - 7:6, 10:6, 13:6, 14:8, 15:14, 16:23, 18:3, 18:16, 19:8, 20:13, 21:14, 23:17, 25:7, 25:9, 25:15, 26:14, 27:14, 29:1, 29:25, 30:16, 31:11, 41:19, 41:21, 44:7, 44:8, 46:11, 48:5, 54:18
**confer** [1] - 56:8
**Conference** [1] - 50:7
**conference** [1] - 50:9
**confidence** [1] - 12:18
**confirm** [1] - 8:11
**confiscated** [1] - 11:13
**confrontation** [1] - 16:12
**connection** [1] - 24:2
**conscience** [1] - 51:25
**consequences** [2] - 24:10, 25:25
**consider** [4] - 22:23, 24:12, 31:6, 48:7
**consideration** [3] - 23:21, 51:13, 53:2
**considering** [2] - 25:2, 53:2
**considers** [1] - 12:18
**constant** [1] - 30:14
**construct** [1] - 25:2

consult [1] - 13:12
consulting [1] - 48:9
contact [8] - 11:23, 12:25, 33:9, 33:11, 33:25, 34:4, 34:5, 34:13
contacted [1] - 45:21
contained [2] - 7:3, 7:10
contents [1] - 4:18
context [2] - 31:15, 41:22
continual [1] - 56:21
continue [3] - 24:5, 42:13, 42:21
continued [3] - 11:10, 15:20, 25:3
continues [4] - 15:16, 19:23, 19:25, 21:22
conversation [3] - 21:20, 27:20, 51:10
conversations [2] - 7:7, 54:22
converse [1] - 33:16
conversely [1] - 33:16
convey [1] - 7:17
convicted [1] - 35:2
convince [2] - 46:3, 46:4
convincing [1] - 39:2
cooperating [1] - 50:10
coping [1] - 37:4
correct [12] - 4:16, 6:23, 7:14, 14:2, 14:10, 14:22, 34:10, 37:16, 37:18, 46:11, 57:8, 59:9
corrections [2] - 6:4, 6:22
corrective [1] - 35:15
correspondence [1] - 10:18
corroborate [1] - 18:25
corroborating [1] - 20:21
counsel [9] - 2:12, 3:15, 5:25, 12:24, 25:5, 48:14, 52:22, 55:14, 58:15
Counsel [1] - 4:22
count [3] - 7:23, 8:13, 21:10
Count [6] - 4:9, 4:20, 57:5, 57:6, 57:8, 58:7
countless [1] - 41:7
country [1] - 28:6
Counts [1] - 58:6

counts [5] - 7:9, 55:9, 57:11, 57:13, 57:16
County [4] - 15:17, 36:19, 46:20, 46:23
course [5] - 11:20, 27:7, 29:16, 43:12, 49:16
COURT [82] - 1:1, 1:23, 2:7, 2:14, 2:20, 3:4, 3:11, 3:20, 4:3, 4:14, 5:9, 5:21, 6:3, 6:11, 6:21, 6:24, 7:11, 7:15, 7:21, 8:8, 8:15, 9:7, 9:13, 9:16, 9:19, 13:13, 13:16, 13:18, 13:21, 13:25, 14:3, 14:14, 14:19, 14:23, 15:11, 15:15, 21:19, 21:22, 21:24, 22:1, 22:5, 27:1, 27:23, 28:2, 28:4, 29:14, 30:17, 31:6, 31:10, 33:7, 33:16, 34:6, 34:18, 35:4, 35:13, 35:21, 37:11, 37:18, 38:13, 39:13, 43:10, 43:14, 44:4, 45:18, 46:7, 46:18, 47:19, 48:10, 48:20, 50:6, 50:12, 55:8, 55:23, 56:7, 56:23, 57:3, 57:8, 57:15, 58:1, 58:8, 58:12, 59:2
Court [53] - 2:2, 2:4, 3:13, 3:17, 3:19, 6:9, 8:11, 8:14, 9:10, 10:6, 15:18, 17:7, 18:7, 18:23, 18:25, 19:19, 20:2, 20:3, 20:16, 23:13, 24:12, 27:4, 27:7, 27:12, 29:24, 30:6, 32:21, 33:2, 34:20, 35:18, 35:20, 35:25, 36:5, 36:23, 37:25, 40:11, 40:14, 43:23, 44:14, 44:17, 46:14, 47:13, 47:14, 47:16, 47:18, 50:8, 53:16, 55:20, 57:22, 59:5, 59:14
court [2] - 6:17, 50:11
Court's [2] - 5:6, 47:10
courtroom [1] - 7:16
crafted [1] - 56:10
Craigslist [3] - 10:13, 22:18, 24:9
crassly [1] - 19:25
credit [3] - 53:17, 53:25, 56:24

credited [3] - 53:19, 56:25, 57:1
crime [2] - 50:15
criminal [2] - 23:17, 40:18
CRIMINAL [1] - 1:4
Criminal [1] - 2:9
CRR [2] - 1:23, 59:8
current [1] - 30:16
custodians [1] - 36:16
custody [2] - 47:4, 53:16
cut [1] - 47:4
cute [1] - 34:9
cuts [1] - 45:18

D

D.C [1] - 22:13
danger [1] - 39:25
dangerous [5] - 22:2, 37:21, 38:25, 45:8, 53:1
dangerousness [1] - 38:9
data [1] - 54:21
date [3] - 20:21, 38:3, 42:19
Dated [1] - 59:12
dating [1] - 10:9
David [1] - 2:10
DAVID [1] - 1:6
days [6] - 20:12, 28:7, 28:24, 56:24, 56:25, 58:17
deal [1] - 17:2
dealing [1] - 14:25, 16:18
decade [1] - 35:4
decorated [1] - 46:1
deemed [3] - 39:7, 39:24, 54:12
deepest [2] - 50:12, 50:14
Defendant [1] - 1:7
defendant [21] - 7:3, 10:18, 10:20, 11:17, 12:14, 12:16, 12:25, 14:16, 15:13, 17:5, 17:13, 18:10, 18:22, 20:11, 20:16, 23:19, 24:17, 26:7, 26:12, 41:16, 50:10
DEFENDANT [6] - 1:16, 6:2, 46:25, 48:19, 48:22, 59:1
defendant's [3] - 12:5, 12:12, 25:6
DEFENDER [1] - 1:17
Defender's [1] - 40:16

defense [13] - 5:12, 7:24, 8:2, 9:22, 12:24, 14:10, 15:8, 16:7, 25:5, 25:18, 27:14, 31:7, 49:13
degree [2] - 33:6, 35:1
Deis [1] - 2:22
deleted [1] - 13:5
deleting [1] - 11:21
deletion [1] - 12:12
denies [3] - 12:24, 12:25, 13:1
DEPUTY [2] - 2:3, 59:4
describe [1] - 39:20
described [3] - 15:14, 25:10, 39:15
describing [1] - 18:5
designated [1] - 56:4
destructive [1] - 25:20
detailed [1] - 27:5
details [1] - 40:13
detain [1] - 45:7
detained [2] - 39:24, 43:7
detention [3] - 28:12, 49:7, 53:20
determination [1] - 38:24
determining [1] - 54:21
deterrence [10] - 23:17, 23:18, 23:19, 23:22, 24:7, 24:8, 27:19, 27:20, 27:24
develop [1] - 37:4
device [1] - 11:22
devices [4] - 32:8, 54:14, 54:19, 55:1
devote [1] - 55:13
diagnosis [1] - 40:25
diary [1] - 28:10
die [2] - 42:10, 42:11
different [8] - 10:2, 16:25, 33:10, 33:22, 36:9, 37:16, 40:10, 51:10
differently [1] - 50:20
difficult [5] - 3:21, 17:1, 23:3, 40:15, 48:12, 53:20
difficulties [4] - 9:9, 9:10, 15:20, 30:15
direct [2] - 18:23, 23:3
directed [1] - 54:7
direction [1] - 10:5
directly [1] - 45:21
disagree [1] - 58:16
disagrees [1] - 5:12
discipline [1] - 45:20
disclose [2] - 13:9,

14:7
disclosed [1] - 16:7
disclosing [1] - 21:24
disclosure [2] - 14:24, 15:4
disclosures [1] - 14:21
discovered [1] - 11:6
discuss [4] - 5:25, 27:8, 37:25, 47:13
discussed [2] - 4:18, 4:19
discussing [1] - 4:22
discussions [3] - 4:20, 5:7, 5:8
dismiss [4] - 57:11, 57:16, 58:6, 58:11
dismissing [1] - 57:13
disposal [1] - 44:17
dispute [4] - 7:2, 25:6, 34:1, 56:23
disputing [2] - 31:1, 33:24
dissuade [1] - 17:24
distance [1] - 22:25
distribution [1] - 32:25
DISTRICT [3] - 1:1, 1:1, 1:9
District [3] - 2:4, 39:2
district [1] - 39:1
dive [1] - 51:8
DIVISION [1] - 1:2
docket [1] - 6:18
doctors [1] - 38:5
done [9] - 7:18, 15:2, 30:2, 35:24, 41:5, 43:9, 44:20, 45:7, 51:12
dose [2] - 30:9, 30:10
double [1] - 5:14
double-sided [1] - 5:14
doubt [3] - 28:17, 29:4, 44:4
down [7] - 9:4, 20:18, 24:6, 37:12, 40:25, 52:7, 52:22
Dr [1] - 41:15
drill [1] - 37:12
drilling [1] - 52:22
drive [1] - 22:14
driving [1] - 31:6
drop [1] - 36:11
drug [1] - 30:9
due [3] - 3:2, 55:11, 57:20
during [7] - 10:11, 10:16, 11:20, 15:24, 16:2, 49:7, 55:11

# E

**e-docket** [1] - 6:18
**early** [1] - 4:5
**earned** [1] - 33:18
**easier** [1] - 42:10
**easily** [1] - 41:1
**east** [1] - 20:17
**Eastern** [1] - 39:1
**ECF** [1] - 5:24
**educated** [1] - 49:7
**education** [2] - 49:24, 52:14
**effect** [3] - 3:15, 22:23, 25:14
**effectively** [3] - 33:24, 34:1, 38:1
**effects** [1] - 15:22
**effort** [1] - 12:13
**efforts** [1] - 22:11
**egregious** [1] - 18:24
**eight** [1] - 36:9
**either** [4] - 4:5, 6:11, 8:5, 28:19
**Elizabeth** [1] - 2:23
**elsewhere** [2] - 18:17, 19:3
**email** [2] - 8:21, 8:25
**emotional** [1] - 30:15
**emotionally** [1] - 18:22
**employed** [2] - 45:19, 58:3
**employees** [1] - 23:25
**enabled** [1] - 49:8
**encourage** [2] - 56:13, 56:14
**encouraged** [1] - 17:5
**encouragement** [1] - 58:23
**end** [6] - 19:16, 21:23, 38:8, 47:17, 53:4, 58:24
**ended** [1] - 41:22
**energies** [1] - 55:13
**enforcement** [5] - 11:7, 11:9, 12:22, 12:24, 21:17
**engage** [5] - 18:16, 27:8, 33:19, 37:19, 38:16
**engaged** [3] - 13:1, 20:13, 31:12
**engages** [1] - 35:2
**engaging** [4] - 15:14, 25:9, 26:1, 26:14
**enjoy** [1] - 17:18
**entered** [1] - 29:22
**enterprising** [1] -

19:20
**entire** [3] - 41:22, 49:13, 49:16
**entitled** [1] - 59:10
**environment** [1] - 45:16
**equipped** [3] - 17:18, 17:19, 28:9
**er** [1] - 56:12
**escalating** [1] - 31:15
**especially** [5] - 14:25, 33:5, 41:6, 42:6, 49:17, 52:9
**ESQUIRE** [3] - 1:14, 1:18, 1:18
**essentially** [5] - 4:9, 5:3, 29:23, 30:8, 38:22
**Essex** [2] - 22:13, 22:14
**established** [1] - 48:1
**et** [4] - 10:14, 11:10, 14:8, 24:21
**evaluated** [1] - 39:12
**evaluation** [1] - 28:20
**EVANS** [1] - 1:6
**Evans** [75] - 2:10, 2:16, 2:21, 2:22, 4:11, 4:15, 4:22, 4:23, 5:23, 10:12, 18:23, 19:18, 22:4, 23:13, 23:14, 28:5, 28:21, 29:12, 29:16, 29:23, 30:20, 31:12, 31:19, 32:15, 33:2, 34:25, 35:23, 36:4, 36:7, 36:10, 36:20, 36:22, 36:24, 37:1, 38:11, 39:23, 40:4, 40:5, 40:8, 40:10, 40:13, 40:20, 41:5, 41:9, 41:18, 41:24, 42:1, 42:8, 42:11, 42:12, 43:4, 43:5, 43:14, 43:16, 43:24, 44:12, 45:1, 45:3, 45:15, 45:16, 46:17, 46:20, 46:23, 47:14, 47:21, 48:11, 50:6, 50:12, 55:18, 56:11, 56:20, 58:2, 58:13
**Evans'** [9] - 3:1, 3:14, 6:7, 27:6, 27:14, 36:18, 44:1, 46:12, 56:5
**events** [3] - 49:4, 49:8, 49:18
**eventually** [1] - 11:11
**evidence** [11] - 4:12, 11:14, 11:25, 13:3,

13:4, 15:2, 15:7, 17:21, 22:19, 32:8, 44:9
**evolves** [2] - 14:17, 14:20
**evolving** [1] - 14:25
**exactly** [4] - 26:22, 36:22, 40:9, 43:15
**examined** [1] - 32:9
**example** [4] - 18:24, 23:23, 38:18, 42:25
**excellent** [1] - 45:17
**except** [3] - 3:15, 44:22, 58:25
**exceptionally** [1] - 28:5
**Exhibit** [6] - 12:4, 18:6, 18:23, 19:10, 20:1, 20:20
**exhibits** [2] - 4:13, 5:12
**exist** [1] - 39:21
**existing** [2] - 12:10, 40:25
**exists** [1] - 39:15
**expect** [5] - 14:24, 31:1, 52:4, 52:5, 54:23
**expected** [1] - 29:3
**expedite** [3] - 3:10, 3:13, 6:20
**experience** [3] - 23:7, 25:19, 49:24
**experienced** [1] - 49:4
**explained** [1] - 10:14
**explaining** [1] - 26:21
**explanation** [1] - 29:3
**exploit** [1] - 17:19
**exploited** [4] - 17:20, 17:22, 24:6, 26:18
**express** [1] - 43:21
**expressed** [2] - 3:16, 43:20
**expresses** [1] - 19:2
**extensive** [1] - 25:4
**extent** [2] - 5:12, 6:11
**external** [1] - 39:15
**extra** [1] - 7:5
**extramarital** [1] - 31:21
**extraordinarily** [3] - 29:17, 30:1, 38:11
**extremely** [3] - 3:21, 42:6, 43:20
**eye** [2] - 51:3
**EZ** [2] - 20:4, 20:8

# F

**facilities** [3] - 43:2,

47:17, 55:18
**facility** [5] - 28:12, 39:7, 39:9, 55:15, 55:21
**fact** [12] - 20:22, 21:4, 22:20, 25:2, 32:3, 33:12, 36:3, 36:6, 47:9, 47:21, 50:17, 52:2
**factor** [2] - 27:24, 33:5
**factors** [5] - 9:24, 21:2, 23:16, 24:12, 26:6
**Facts** [1] - 10:15
**facts** [3] - 5:3, 14:8, 33:23
**factual** [2] - 5:1, 43:24
**failed** [1] - 57:4
**failing** [1] - 26:2
**fair** [3] - 24:24, 35:21, 50:13
**false** [2] - 11:17, 14:10
**families** [2] - 25:14, 48:13
**family** [9] - 2:24, 3:22, 17:6, 44:5, 49:10, 51:25, 54:1, 56:12, 56:13
**family's** [1] - 12:19
**far** [4] - 2:17, 2:23, 12:11, 52:15
**Farmer** [1] - 2:24
**fashion** [3] - 10:3, 30:24, 39:8
**fast** [1] - 28:16
**father** [4] - 2:21, 9:1, 10:11, 43:21
**FCI** [2] - 55:18, 56:11
**FCRR** [2] - 1:23, 59:8
**February** [1] - 59:12
**FEDERAL** [2] - 1:17, 1:23
**Federal** [2] - 40:16, 59:14
**federal** [4] - 34:12, 39:6, 46:21, 56:21
**feelings** [1] - 17:22
**felt** [1] - 30:12
**few** [5] - 2:18, 10:3, 10:23, 31:9, 49:11
**fifteen** [2] - 35:8, 44:24
**figured** [1] - 26:17
**figures** [1] - 19:20
**file** [2] - 13:20, 38:3
**filed** [3] - 4:4, 5:24, 33:23
**film** [1] - 18:3
**final** [1] - 7:12
**Financial** [1] - 55:12

**findings** [1] - 46:15
**fine** [3] - 5:9, 47:19, 55:3
**first** [20] - 3:12, 5:22, 10:6, 12:6, 12:9, 14:4, 17:10, 17:11, 26:4, 27:10, 27:17, 27:18, 30:9, 30:12, 31:11, 32:22, 33:3, 38:10, 49:1
**five** [3] - 45:21, 51:20, 55:9
**fix** [1] - 28:11
**flattery** [1] - 19:11
**flow** [1] - 58:2
**focus** [1] - 27:9
**focused** [1] - 44:13
**focusing** [1] - 27:12
**folks** [4] - 13:4, 46:3, 52:24, 52:25
**follow** [2] - 5:19, 46:1
**following** [1] - 36:17
**follows** [1] - 45:16
**font** [4] - 8:24, 8:25, 9:4, 9:5
**FOR** [3] - 1:1, 1:12, 1:16
**forced** [1] - 21:25
**foregoing** [1] - 59:9
**foreseeable** [1] - 25:25
**forever** [2] - 51:21, 51:22
**forget** [1] - 49:21
**forgive** [1] - 33:7
**forgiving** [1] - 49:18
**form** [2] - 6:9, 8:20
**formal** [1] - 42:25
**format** [4] - 8:16, 8:24, 9:9, 9:10
**Fort** [1] - 20:18
**forthcoming** [2] - 14:9, 15:25
**fortunate** [1] - 11:3
**forward** [7] - 13:9, 16:2, 26:20, 29:5, 29:6, 30:23, 53:24
**forwarded** [1] - 38:4
**four** [1] - 8:13
**Fourteen** [1] - 58:7
**Frankly** [1] - 41:16
**frankly** [3] - 38:10, 39:4, 42:23
**free** [1] - 24:3
**frequent** [1] - 20:23
**Friday** [1] - 4:5
**friend** [1] - 2:24
**friends** [2] - 36:18, 49:10

**front** [2] - 31:20, 39:1
**fully** [3] - 39:16, 51:4, 51:11
**furious** [1] - 12:17
**future** [8] - 11:24, 26:15, 27:12, 27:16, 32:12, 32:14, 38:9, 39:17

**G**

**gainfully** [2] - 45:19, 58:3
**Gaithersburg** [1] - 46:24
**gall** [1] - 34:21
**gallery** [1] - 2:19
**gambling** [1] - 25:13
**garbage** [1] - 17:14
**general** [6] - 23:19, 23:22, 24:8, 27:18, 27:20, 27:24
**generally** [1] - 33:4
**genuine** [1] - 49:2
**Germantown** [1] - 20:14
**girls** [3] - 26:1, 29:7, 30:25
**given** [17] - 4:14, 4:25, 5:13, 5:15, 8:4, 8:17, 8:19, 8:21, 8:22, 9:24, 12:19, 15:5, 38:12, 46:11, 46:12, 58:13
**glad** [1] - 51:1
**government** [40] - 2:8, 3:23, 5:2, 5:4, 7:25, 8:1, 8:13, 9:18, 13:12, 15:5, 16:13, 19:11, 21:5, 24:20, 26:23, 27:11, 27:18, 30:19, 32:6, 32:9, 32:16, 33:25, 38:7, 38:25, 39:3, 41:20, 44:6, 44:10, 45:6, 45:7, 47:25, 51:15, 52:20, 52:25, 53:6, 53:7, 54:3, 55:6, 58:6, 58:10
**Government's** [5] - 12:4, 12:7, 20:1, 20:20, 22:4
**government's** [3] - 4:12, 4:13, 7:5
**GPS** [1] - 47:3
**granted** [1] - 58:12
**grapple** [1] - 30:2
**grappled** [1] - 28:20
**grateful** [2] - 26:20
**gratification** [1] - 18:2

**gravity** [1] - 51:11
**great** [4] - 2:20, 6:21, 19:12, 40:24
**greater** [1] - 53:12
**greatest** [3] - 28:2, 28:4, 51:5
**GREENBELT** [3] - 1:10, 1:15, 1:24
**group** [1] - 42:24
**guarantee** [1] - 56:11
**guardian** [2] - 16:8, 16:10
**guess** [3] - 5:9, 9:2, 33:7
**guidance** [1] - 5:17
**guidelines** [5] - 5:7, 24:19, 24:22, 24:23, 54:3
**guilt** [1] - 16:25
**guilty** [2] - 11:1, 50:8
**guy** [1] - 22:2
**guys** [3] - 19:3, 19:4, 19:7

**H**

**HAGAN** [33] - 1:14, 2:9, 4:17, 5:20, 7:1, 7:13, 8:6, 8:10, 9:6, 9:8, 9:15, 9:18, 10:1, 13:15, 13:17, 13:24, 14:1, 14:4, 14:17, 14:22, 14:24, 15:12, 15:16, 21:21, 21:23, 21:25, 22:4, 22:6, 48:8, 55:5, 57:17, 58:5, 58:9
**Hagan** [12] - 2:11, 5:10, 5:19, 6:25, 8:9, 9:20, 13:19, 27:1, 47:20, 57:16, 57:19, 57:24
**hand** [2] - 6:20, 31:14
**handful** [2] - 52:24, 52:25
**handle** [2] - 17:19, 37:23
**hands** [1] - 11:13
**handwriting** [2] - 8:18, 8:23
**handwritten** [1] - 8:20
**happy** [4] - 3:18, 27:8, 37:25, 47:13
**hard** [4] - 5:18, 32:7, 37:5, 49:14
**harm** [2] - 32:25, 49:20
**harmful** [1] - 29:4
**harming** [1] - 25:20, 25:21

**headed** [1] - 43:12
**healing** [1] - 49:9
**health** [8] - 38:19, 40:24, 41:10, 42:4, 43:1, 43:4, 56:2, 56:5
**healthy** [2] - 25:12, 30:21
**hear** [2] - 45:22, 52:19
**heard** [1] - 52:8
**HEARING** [1] - 1:8
**hearing** [4] - 11:15, 13:3, 13:4, 52:5
**heart** [2] - 51:8, 53:11
**heartened** [1] - 52:19
**heat** [1] - 28:13
**help** [7] - 23:15, 39:17, 49:24, 50:1, 50:2, 50:3, 53:24
**helped** [1] - 50:4
**helpful** [3] - 6:13, 29:10, 41:17
**helping** [1] - 36:21
**helps** [1] - 52:16
**hesitant** [1] - 14:12
**hid** [1] - 31:19
**hidden** [1] - 42:1
**hide** [1] - 18:19
**high** [2] - 24:19, 30:9
**higher** [3] - 21:5, 24:22, 35:1
**highlight** [1] - 18:8
**highlighted** [1] - 18:9
**himself** [7] - 26:14, 30:2, 40:22, 41:11, 42:8, 44:2
**history** [5] - 6:7, 10:7, 27:6, 27:15, 31:21
**hit** [2] - 20:22, 50:20
**hoarding** [1] - 32:9
**hold** [1] - 48:16
**home** [4] - 39:9, 39:10, 42:13, 51:16
**honest** [2] - 51:4
**Honor** [68] - 2:12, 2:15, 2:19, 4:2, 4:17, 4:20, 5:20, 6:2, 6:5, 7:1, 7:13, 7:14, 7:20, 8:6, 8:7, 8:10, 9:6, 9:8, 9:15, 9:18, 10:1, 12:8, 13:12, 13:15, 13:22, 13:24, 18:6, 19:10, 20:1, 21:3, 22:7, 22:25, 23:16, 26:6, 26:25, 27:3, 28:3, 29:11, 29:18, 31:5, 31:8, 31:18, 33:15, 34:3, 35:24, 40:7, 40:12, 41:13, 43:12, 43:22, 43:23,

44:15, 45:10, 47:6, 47:12, 48:9, 48:19, 48:22, 55:5, 55:17, 56:19, 57:12, 57:14, 57:17, 57:19, 58:5, 58:10, 59:1
**HONORABLE** [1] - 1:9
**Honorable** [2] - 2:5, 59:5
**hope** [7] - 48:24, 49:18, 49:19, 49:22, 51:5, 52:15, 55:12
**hopefully** [5] - 6:20, 7:1, 11:23, 20:3, 52:8
**hopes** [1] - 58:23
**horrible** [2] - 50:25
**horrific** [1] - 11:21
**horse** [1] - 33:10
**hotel** [1] - 18:19
**hours** [1] - 41:7
**house** [2] - 15:13, 39:7
**housed** [2] - 39:9, 55:24
**HSI** [1] - 2:12
**hundred** [2] - 28:7, 28:24
**hurt** [3] - 25:10, 42:8, 49:16

**I**

**ICC** [2] - 20:18, 20:24
**ICCC** [1] - 20:11
**idea** [2] - 17:23, 29:23
**identifying** [1] - 14:12
**II** [1] - 1:19
**ill** [1] - 42:6
**illegal** [1] - 26:4
**images** [8] - 32:2, 32:5, 32:6, 32:10, 32:12, 33:17, 38:22, 54:22
**imagine** [1] - 5:10
**immediately** [2] - 11:19, 54:24
**Impact** [5] - 8:12, 8:23, 9:16, 11:4, 26:21
**impact** [4] - 4:19, 15:19, 17:7
**important** [8] - 16:17, 21:13, 25:1, 27:5, 32:11, 34:22, 39:22, 42:15
**impose** [5] - 37:14, 48:18, 52:3, 53:7, 55:3
**imposed** [1] - 39:23

**imposing** [2] - 51:15, 55:20
**imprisonment** [2] - 7:24, 26:10
**IN** [1] - 1:1
**inadequate** [1] - 28:12
**incarcerable** [1] - 53:1
**incarcerated** [2] - 34:23, 52:21
**incarceration** [4] - 44:18, 47:22, 53:13, 56:21
**incentive** [2] - 39:14, 39:16, 45:5
**incentives** [1] - 39:20
**include** [2] - 6:6, 50:9
**included** [1] - 31:16
**inconsistencies** [1] - 4:24
**indefinitely** [1] - 39:25
**indicate** [1] - 24:22
**indicated** [2] - 27:5, 30:6
**indication** [2] - 32:13, 32:23
**indictment** [1] - 58:11
**Indictment** [2] - 4:10, 58:10
**indigency** [3] - 57:22, 57:23, 58:4
**indirectly** [1] - 45:22
**individual** [7] - 21:15, 30:8, 32:1, 44:21, 45:1, 45:8, 45:25
**individuals** [11] - 2:18, 24:4, 31:22, 33:12, 34:13, 35:2, 35:19, 36:7, 38:21, 39:7, 43:3
**indulgence** [1] - 47:10
**informal** [1] - 42:17
**information** [5] - 6:7, 9:24, 10:14, 14:6, 15:2
**informs** [1] - 19:25
**infraction** [1] - 47:2
**initial** [2] - 14:19, 54:18
**injury** [1] - 44:11
**Inmate** [1] - 55:12
**inmates** [3] - 28:8, 28:23, 37:20
**input** [1] - 3:6
**inside** [1] - 39:20
**install** [1] - 54:13
**instance** [2] - 17:10, 17:11
**institution** [1] - 6:19
**institutions** [1] - 39:6
**intended** [2] - 20:1,

49:19
**intending** [1] - 5:11
**intensive** [1] - 42:18
**interact** [2] - 22:9, 23:1
**interaction** [1] - 23:7
**interest** [4] - 19:9, 23:24, 28:11, 35:20
**interested** [1] - 19:6
**internal** [1] - 39:14
**Internet** [2] - 23:20, 24:1
**interpreted** [1] - 19:6
**interrupt** [1] - 45:24
**interrupting** [1] - 13:11
**intervention** [1] - 21:17
**interview** [4] - 12:23, 13:10, 14:4, 15:1
**introduce** [1] - 2:19
**intuitively** [1] - 42:20
**intwined** [1] - 30:15
**invent** [1] - 54:15
**invested** [1] - 36:20
**investigating** [1] - 11:20
**investigation** [1] - 15:3
**investigative** [1] - 12:15
**investigator** [1] - 2:23
**inviting** [1] - 52:10
**involve** [2] - 30:20, 30:21
**involved** [2] - 48:13, 50:18
**involving** [4] - 15:12, 15:13, 21:15, 23:22
**isolated** [1] - 21:14
**isolation** [1] - 41:19

### J

**Jack** [1] - 31:14
**Jackie** [1] - 2:22
**Jackson** [1] - 7:17
**January** [1] - 18:20
**Jeffrey** [1] - 2:25
**Jessica** [2] - 2:22, 3:16
**job** [1] - 26:21
**John** [1] - 3:1
**joined** [3] - 2:12, 2:18, 2:21
**judge** [2] - 39:1, 48:2
**JUDGE** [1] - 1:9
**judges** [1] - 39:4
**judgment** [2] - 37:14,

56:9
**July** [1] - 10:9
**jump** [1] - 34:17
**jumping** [1] - 10:3
**June** [1] - 10:9
**Junior** [1] - 2:10

### K

**keep** [3] - 12:14, 35:18, 56:14
**kept** [1] - 31:14
**Kerr** [2] - 59:8, 59:14
**KERR** [1] - 1:23
**keyed** [1] - 33:8
**Kik** [1] - 12:6
**Kik's** [1] - 19:21
**kind** [8] - 9:4, 17:1, 17:14, 36:1, 39:19, 48:3, 48:4
**King** [1] - 18:13
**knowing** [1] - 35:20
**knows** [2] - 20:16, 46:1

### L

**LANE** [2] - 1:14, 1:24
**language** [4] - 35:14, 37:7, 56:9, 56:17
**large** [1] - 40:20
**largely** [1] - 41:5
**larger** [2] - 8:25, 9:5
**last** [6] - 18:18, 23:8, 28:7, 28:24, 49:11, 56:20
**lastly** [1] - 49:15
**late** [3] - 4:5, 12:8, 29:21
**law** [6] - 11:7, 11:9, 12:22, 12:24, 21:17, 39:24
**leader** [1] - 46:3
**learn** [3] - 37:4, 54:23, 56:24
**learned** [4] - 11:12, 40:21, 40:22, 40:23
**learning** [5] - 30:5, 41:10, 41:11, 41:12
**learns** [1] - 33:13
**least** [7] - 15:10, 16:11, 16:12, 17:23, 25:3, 52:3, 54:17
**led** [1] - 40:22
**left** [7] - 2:17, 4:8, 4:21, 9:4, 43:14, 43:16, 43:24
**legible** [1] - 9:11
**less** [1] - 8:22

**lessons** [1] - 49:21
**letter** [5] - 4:5, 4:7, 8:19, 43:21, 49:2
**letting** [1] - 56:14
**level** [1] - 7:12
**license** [1] - 20:6
**life** [18] - 31:16, 37:5, 37:13, 40:13, 40:23, 41:22, 41:25, 42:3, 42:14, 43:14, 43:16, 43:18, 49:17, 49:20, 50:3, 54:4, 56:14
**lifetime** [4] - 21:6, 26:9, 49:4, 52:3
**light** [1] - 7:7
**likelihood** [1] - 47:24
**likely** [3] - 5:10, 45:6, 51:22
**limited** [2] - 20:2, 45:23
**line** [1] - 31:25
**link** [1] - 23:4
**lips** [1] - 36:12
**live** [4] - 3:22, 10:10, 11:2, 36:8
**lives** [1] - 15:21
**living** [6] - 10:25, 17:9, 20:17, 27:24, 31:16, 52:21
**locally** [1] - 15:17
**log** [1] - 38:23
**longstanding** [1] - 51:21
**look** [13] - 12:22, 16:17, 21:2, 22:22, 33:12, 34:5, 36:1, 37:21, 41:21, 43:23, 51:3, 57:13
**Look** [1] - 13:5
**look-see** [1] - 37:21
**looked** [2] - 26:6, 34:3
**looking** [10] - 8:17, 12:1, 32:11, 33:1, 34:23, 34:24, 51:14, 51:16, 51:24, 57:17
**looks** [5] - 8:21, 8:25, 9:3, 19:12, 20:3
**loud** [1] - 18:17
**love** [3] - 12:17, 17:24, 51:6
**loved** [1] - 51:17
**low** [4] - 33:4, 55:19, 55:21, 56:12
**lower** [4] - 34:5, 34:12, 54:2, 54:3
**luck** [1] - 58:18
**Luther** [1] - 18:13

### M

**mail** [1] - 38:23
**man** [2] - 28:5, 40:12
**management** [7] - 36:25, 37:1, 37:15, 42:17, 42:23, 55:22, 55:25
**mandate** [1] - 53:11
**mandatory** [6] - 7:22, 21:4, 21:11, 51:18, 53:7, 53:9
**manipulated** [1] - 18:22
**manner** [1] - 23:19
**MARLENE** [1] - 1:23
**Marlene** [2] - 59:8, 59:14
**marriage** [1] - 15:22
**marshals** [1] - 47:3
**MARTIN** [1] - 1:23
**Martin** [3] - 18:13, 59:8, 59:14
**Martin-Kerr** [2] - 59:8, 59:14
**MARTIN-KERR** [1] - 1:23
**MARYLAND** [5] - 1:1, 1:10, 1:15, 1:19, 1:24
**Maryland** [2] - 2:5, 10:10
**material** [1] - 5:16
**matter** [4] - 4:4, 8:3, 32:15, 59:10
**matters** [2] - 3:2, 43:24
**maximize** [1] - 56:10
**maximum** [1] - 57:6
**McHenry** [1] - 20:18
**mean** [8] - 3:20, 14:20, 21:19, 33:10, 34:20, 44:4, 45:18, 45:24
**meaning** [2] - 43:25, 48:4
**meaningful** [4] - 41:3, 43:18, 45:14, 47:8
**means** [2] - 7:11, 7:21
**Mechanical** [1] - 1:21
**mechanisms** [1] - 37:4
**medical** [1] - 6:19
**medicatable** [1] - 41:1
**medication** [1] - 41:1
**meet** [8] - 16:1, 18:10, 18:11, 18:12, 20:19, 22:3, 22:11, 22:16
**meeting** [9] - 10:20, 11:9, 11:16, 12:25,

16:3, 16:8, 16:12, 18:12, 18:20
**meets** [1] - 12:24
**member** [1] - 49:23
**members** [1] - 33:22
**memo** [1] - 46:22
**memorandum** [4] - 6:10, 7:2, 9:23, 33:24
**mental** [8] - 38:19, 40:24, 41:10, 42:4, 43:1, 43:4, 56:2, 56:4
**mentally** [1] - 42:6
**mentioned** [1] - 53:18
**merit** [1] - 21:3
**message** [1] - 19:9
**met** [4] - 4:11, 16:3, 41:16, 45:4
**mid-40s** [1] - 43:8
**Middle** [1] - 22:14
**might** [3] - 14:24, 24:4, 43:1
**military** [2] - 45:17, 46:2
**mind** [4] - 17:13, 17:15, 19:1, 48:24
**mine** [1] - 50:4
**minimum** [7] - 7:23, 14:15, 21:4, 21:11, 51:18, 53:8, 53:9
**minor** [3] - 4:9, 22:15, 54:23
**minors** [1] - 22:20
**minute** [1] - 37:12
**minutes** [1] - 10:4
**mischaracterized** [1] - 14:1
**misses** [1] - 19:25
**missing** [1] - 28:18
**mitigating** [1] - 44:5
**modalities** [1] - 35:10
**modeling** [1] - 22:8
**models** [2] - 10:14, 25:24
**mom** [4] - 8:20, 11:20, 16:11, 21:17
**moment** [7] - 8:11, 13:12, 13:15, 13:17, 13:20, 24:13, 24:18
**MONDAY** [1] - 1:10
**money** [5] - 20:5, 20:8, 25:13, 45:22, 51:23
**monitored** [2] - 46:6, 46:19
**monitoring** [2] - 35:10, 54:13
**Montgomery** [2] - 15:17, 46:20
**monthly** [1] - 58:2

**months** [10] - 10:23, 11:11, 21:6, 23:8, 23:11, 43:7, 46:21, 53:16, 57:6
**moral** [1] - 16:22
**morning** [4] - 2:17, 3:1, 4:7, 4:11
**mortified** [1] - 33:12
**most** [8] - 18:24, 27:5, 31:20, 44:13, 48:21, 49:5, 49:17, 51:17
**mother** [4] - 8:21, 11:1, 17:8, 23:9
**mother's** [3] - 6:7, 17:9, 41:25
**motivated** [1] - 45:3
**move** [4] - 8:1, 53:3, 58:6, 58:11
**moved** [1] - 10:9
**MR** [80] - 2:9, 2:15, 2:21, 3:8, 3:12, 4:1, 4:4, 4:16, 4:17, 4:18, 5:20, 6:5, 6:16, 6:23, 7:1, 7:13, 7:14, 8:6, 8:7, 8:10, 9:6, 9:8, 9:15, 9:18, 10:1, 13:11, 13:15, 13:17, 13:19, 13:24, 14:1, 14:4, 14:17, 14:22, 14:24, 15:12, 15:16, 21:21, 21:23, 21:25, 22:4, 22:6, 27:3, 28:1, 28:3, 29:11, 29:15, 31:5, 31:8, 31:11, 33:15, 33:21, 34:10, 34:19, 35:12, 35:17, 35:22, 37:16, 37:22, 38:14, 39:21, 43:12, 43:15, 44:15, 46:5, 46:9, 46:19, 47:1, 47:12, 48:8, 55:5, 55:17, 55:24, 56:19, 57:1, 57:12, 57:17, 57:19, 58:5, 58:9
**MS** [3] - 7:20, 13:22, 57:5
**multiple** [2] - 21:15, 22:20
**must** [2] - 26:13, 54:25
**MVA** [1] - 20:20

## N

**narrowing** [1] - 4:6
**naturally** [1] - 19:6
**nature** [6] - 10:7, 16:18, 18:5, 32:17, 38:23, 50:15

**near** [3] - 20:14, 21:12, 53:6
**necessarily** [2] - 15:7, 34:11
**necessary** [2] - 46:14, 53:12
**need** [12] - 13:18, 15:25, 18:18, 22:23, 40:6, 41:4, 41:21, 43:6, 46:12, 50:1, 50:3, 51:9
**needed** [1] - 11:9
**needs** [8] - 25:16, 36:10, 43:3, 43:4, 43:17, 44:2, 44:21, 56:5
**negative** [2] - 58:2
**net** [6] - 10:12, 17:12, 22:17, 22:18, 26:16, 58:2
**never** [5] - 40:15, 42:8, 49:19, 49:21, 58:25
**new** [3] - 10:17
**news** [1] - 58:25
**next** [2] - 15:1, 19:23
**NO** [1] - 1:4
**nobody** [2] - 36:2, 52:25
**non** [1] - 34:23
**non-incarcerated** [1] - 34:23
**none** [4] - 16:15, 32:25, 55:5
**NOON** [1] - 1:10
**North** [2] - 37:23, 39:2
**northeast** [1] - 20:17
**note** [9] - 10:19, 21:13, 39:13, 44:12, 54:1, 56:12, 56:20, 58:1, 58:17
**noted** [1] - 25:4
**notes** [1] - 48:25
**nothing** [4] - 4:1, 14:9, 44:20, 46:9
**Notification** [1] - 54:6
**notion** [1] - 45:25
**November** [3] - 12:8, 20:11, 20:21
**nowhere** [2] - 21:11, 21:12
**numb** [1] - 30:22
**number** [8] - 4:9, 30:4, 31:24, 39:5, 41:7, 44:24, 45:1, 55:7
**numbers** [1] - 7:10

## O

**Oberio** [1] - 2:23
**object** [1] - 46:11

**objection** [3] - 7:9, 46:7, 46:14
**objective** [1] - 22:7
**obviously** [13] - 11:18, 11:24, 16:7, 16:8, 21:8, 23:1, 23:10, 24:11, 24:19, 26:13, 51:24, 54:23, 57:10
**occasional** [1] - 19:11
**occurred** [1] - 33:25
**OCTOBER** [1] - 1:10
**OF** [5] - 1:1, 1:3, 1:8, 1:13, 1:17
**offend** [2] - 47:24, 47:25
**offender** [13] - 21:8, 26:13, 36:25, 37:9, 37:14, 42:17, 42:22, 54:8, 54:11, 55:22, 55:25
**Offender** [1] - 54:6
**offenders** [1] - 37:21
**offense** [9] - 7:12, 10:8, 18:6, 22:22, 29:1, 48:3, 51:4, 51:15, 53:9
**offenses** [8] - 10:8, 24:20, 33:6, 34:4, 34:5, 34:13, 35:3, 48:4
**offer** [1] - 40:4
**OFFICE** [2] - 1:13, 1:17
**office** [6] - 15:18, 35:19, 44:13, 46:9, 52:12, 54:12
**Office** [1] - 35:2, 40:16
**officer** [4] - 36:14, 36:17, 54:7, 54:13
**Officer** [1] - 36:19
**officers** [1] - 36:9
**Official** [1] - 59:14
**OFFICIAL** [1] - 1:23
**old** [2] - 10:22, 19:20
**older** [4] - 11:16, 12:17, 22:2, 43:7
**olds** [1] - 33:18
**once** [3] - 34:15, 49:22, 50:25
**one** [50] - 3:9, 3:12, 4:9, 7:3, 8:3, 8:17, 8:24, 9:4, 12:9, 12:19, 13:12, 14:15, 14:20, 15:10, 15:11, 15:12, 16:2, 16:4, 16:6, 16:13, 19:12, 20:2, 20:12, 21:10, 23:3, 23:12, 25:1, 25:12, 27:5, 29:2, 29:3, 30:3, 30:7,

**objection**
31:20, 31:24, 32:22, 36:18, 42:22, 44:24, 50:12, 51:2, 51:20, 51:24, 52:23, 52:25, 53:12, 53:21, 57:13
**One** [3] - 4:10, 4:20, 58:6
**ones** [2] - 24:16, 51:17
**ongoing** [1] - 46:12
**online** [2] - 17:13, 22:3
**open** [5] - 4:21, 31:19, 40:6, 43:24, 52:1
**Open** [1] - 50:11
**operate** [1] - 23:20
**opinion** [1] - 45:23
**opportunities** [1] - 35:16
**opportunity** [4] - 6:8, 35:18, 48:23, 49:22
**opposite** [1] - 53:14
**options** [2] - 40:4, 42:18
**order** [2] - 36:24, 45:20
**Order** [1] - 2:2
**original** [2] - 4:10, 58:11
**originally** [1] - 15:17
**otherwise** [3] - 18:8, 56:24, 58:18
**outlets** [1] - 25:8
**outlined** [2] - 30:16, 55:14
**outside** [1] - 13:18
**outstanding** [1] - 9:2
**overall** [1] - 31:16
**overcome** [2] - 49:24, 49:25
**own** [8] - 15:6, 18:1, 25:19, 25:21, 28:5, 41:6, 42:2, 42:4

## P

**P.M** [1] - 59:6
**packet** [1] - 5:16
**page** [5] - 8:19, 8:22, 9:5, 19:23, 30:13
**pages** [1] - 5:14
**paid** [1] - 29:7
**pain** [1] - 30:22
**painful** [1] - 30:15
**paper** [1] - 58:23
**parent** [2] - 50:20, 50:21
**parse** [1] - 12:3
**part** [18] - 17:10, 17:16, 18:12, 20:15, 20:24, 26:4, 28:18,

29:19, 29:22, 30:18, 31:4, 32:17, 34:13, 34:21, 34:23, 42:25, 45:14, 55:12
**participant** [1] - 40:7
**participate** [4] - 38:18, 39:16, 45:4, 54:10
**participation** [1] - 56:1
**particular** [3] - 28:11, 47:23, 55:15
**particularly** [3] - 28:10, 31:2, 31:3
**parts** [1] - 18:6
**party** [1] - 36:16
**Pass** [2] - 20:4, 20:8
**passed** [1] - 42:1
**passes** [1] - 36:11
**past** [5] - 27:6, 27:14, 30:15, 33:22, 38:2
**path** [1] - 24:6
**patience** [1] - 50:5
**PATRICIA** [1] - 1:18
**Patricia** [1] - 2:16
**pattern** [3] - 21:14, 22:7, 32:4
**Paula** [1] - 2:5
**PAULA** [1] - 1:9
**pause** [3] - 13:14, 13:23, 47:11
**payable** [2] - 55:11, 57:24
**pedophile** [1] - 41:16
**pen** [1] - 58:23
**penalty** [1] - 21:11
**people** [10] - 17:13, 17:17, 25:10, 26:16, 31:20, 36:19, 39:5, 42:6, 43:19, 54:25
**perhaps** [3] - 17:15, 44:18, 53:10
**period** [5] - 10:11, 10:16, 15:24, 20:25, 35:15
**periodic** [1] - 54:19
**periodically** [1] - 39:10
**permits** [2] - 39:25, 57:21
**perpetrated** [1] - 11:17
**person** [17] - 10:20, 11:6, 11:8, 11:24, 13:9, 14:12, 17:9, 22:9, 25:18, 34:7, 36:16, 38:24, 40:10, 40:12, 44:23, 49:6
**persona** [1] - 45:20
**personal** [1] - 27:15
**personally** [1] - 22:9

**Petersburg** [2] - 55:19, 56:12
**petrifying** [1] - 29:2
**phase** [1] - 54:18
**philosophical** [1] - 27:19
**phone** [5] - 11:15, 12:5, 12:12, 12:13, 54:15
**phonetic** [2] - 30:7, 41:15
**physical** [1] - 12:25
**pic** [1] - 19:23
**picks** [1] - 19:19
**picture** [3] - 19:13, 19:14, 41:18
**pictures** [3] - 22:8, 33:12, 33:19
**piece** [1] - 53:5
**place** [5] - 17:8, 18:18, 26:5, 51:17, 52:15
**placement** [1] - 55:21
**Plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:12
**planning** [1] - 3:14
**plate** [1] - 20:7
**playing** [1] - 31:14
**plaza** [2] - 20:7, 20:22
**plea** [4] - 4:21, 7:4, 29:20, 50:8
**plucking** [1] - 24:4
**plus** [2] - 35:5, 49:7
**point** [7] - 3:23, 27:13, 27:18, 30:19, 34:16, 39:11, 53:13
**pointing** [1] - 9:3
**points** [3] - 7:5, 27:17, 31:9
**police** [1] - 11:7
**Police** [1] - 36:19
**policy** [1] - 50:8
**pornography** [2] - 32:2, 32:10
**portion** [1] - 44:16
**position** [6] - 3:20, 7:5, 7:8, 15:24, 20:4, 24:20
**positive** [1] - 36:5
**possible** [4] - 40:4, 56:10, 56:16, 58:16
**potentially** [1] - 15:9
**pre** [1] - 40:25
**pre-existing** [1] - 40:25
**predation** [1] - 16:19
**predilection** [1] - 34:7
**predisposed** [1] - 33:13
**prefers** [1] - 47:18

**preliminarily** [1] - 9:22
**preliminary** [1] - 8:3
**prep** [2] - 16:2
**prepare** [1] - 15:25
**prepared** [5] - 4:22, 5:2, 7:17, 11:10, 47:15
**preponderance** [1] - 15:7
**prepped** [1] - 16:4
**presence** [1] - 3:7
**present** [3] - 2:17, 3:18, 27:15
**presentation** [2] - 27:9, 27:11
**presented** [1] - 4:24
**presentence** [7] - 5:23, 5:25, 6:4, 6:6, 6:14, 38:3, 58:1
**preserve** [1] - 9:12
**presided** [1] - 35:25
**presiding** [1] - 2:6
**pretrial** [6] - 7:8, 28:12, 36:15, 46:20, 53:20, 56:21
**pretty** [1] - 38:21
**prevent** [1] - 26:5
**preyed** [1] - 50:24
**preying** [1] - 17:17
**pride** [1] - 51:25
**primarily** [4] - 27:11, 34:11, 39:6, 39:8
**prison** [3] - 17:18, 21:16, 25:3
**Prisons** [7] - 36:24, 37:19, 38:5, 42:17, 53:17, 54:7, 56:2
**Prisons'** [1] - 55:19
**proactive** [1] - 37:20
**proactively** [2] - 38:7, 52:6
**probation** [13] - 6:14, 21:7, 35:5, 35:18, 36:9, 36:14, 36:17, 46:9, 52:12, 54:7, 54:12, 54:13, 54:17
**Probation** [1] - 35:2
**problem** [1] - 30:23
**procedure** [1] - 3:3
**procedures** [1] - 55:20
**proceed** [2] - 5:3, 13:24
**proceeding** [5] - 3:10, 10:2, 15:5, 27:16, 40:19, 50:9
**Proceedings** [1] - 1:21
**PROCEEDINGS** [1] - 1:8
**proceedings** [1] -

59:10
**proceeds** [1] - 38:25
**process** [18] - 6:20, 11:5, 11:10, 14:25, 15:16, 15:21, 16:24, 30:4, 37:24, 37:25, 39:14, 40:21, 41:23, 42:2, 44:1, 44:2, 49:9, 50:14
**Produced** [1] - 1:21
**production** [4] - 7:23, 21:10, 32:4, 53:10
**productive** [1] - 49:23
**professes** [1] - 19:8
**professing** [1] - 17:24
**professional** [1] - 37:13
**proffer** [2] - 5:1, 5:3
**Program** [1] - 55:12
**program** [14] - 36:25, 37:1, 37:3, 37:10, 37:15, 42:19, 42:25, 45:6, 48:1, 52:19, 54:11, 56:1, 58:20
**programming** [2] - 6:13, 55:18
**programs** [5] - 38:19, 39:12, 39:16, 45:5, 55:14
**progress** [1] - 41:25
**prohibited** [1] - 54:21
**prolongs** [1] - 44:10
**promises** [1] - 52:21
**proof** [1] - 4:25
**prosecution** [1] - 16:22
**protect** [6] - 12:13, 24:11, 39:17, 44:22, 52:18, 53:5
**protecting** [5] - 26:14, 26:15, 30:24, 30:25, 51:14
**prove** [3] - 15:7, 20:15, 23:3
**proven** [1] - 15:9
**provide** [2] - 6:9, 29:3
**provided** [5] - 6:13, 8:20, 33:3, 33:21, 41:17
**providing** [1] - 33:4
**PSR** [4] - 7:9, 20:16, 21:8, 26:11
**psychosexual** [1] - 28:19
**Public** [1] - 40:16
**PUBLIC** [1] - 1:17
**public** [16] - 24:11, 30:25, 32:20, 32:22, 33:1, 36:23, 39:17, 39:22, 43:6, 44:16,

45:15, 45:20, 51:14, 52:1, 52:18, 53:5
**publicly** [1] - 48:23
**pulling** [1] - 13:19
**punishment** [1] - 34:22
**purpose** [2] - 5:5, 20:2
**purposes** [1] - 54:20
**put** [6] - 28:15, 28:21, 37:14, 45:19, 47:2, 49:11
**putting** [3] - 3:23, 25:21, 28:16
**PX-16-0421** [1] - 1:4
**PX-16-421** [1] - 2:9

**Q**

**qualify** [1] - 55:21
**query** [1] - 9:2
**quest** [1] - 30:14
**questioning** [1] - 16:12
**questions** [2] - 3:18, 47:14
**quite** [7] - 9:22, 46:3, 48:1, 48:11, 48:24, 52:13, 58:3
**quotes** [1] - 47:3

**R**

**raise** [2] - 31:8, 34:16
**raised** [2] - 24:13, 27:18
**raises** [1] - 30:19
**range** [1] - 51:22
**rate** [1] - 34:4
**rates** [1] - 33:4
**RDAP** [4] - 37:1, 37:3, 55:22, 56:1
**re** [4] - 19:20, 39:12, 47:24, 47:25
**re-access** [1] - 19:20
**re-evaluated** [1] - 39:12
**re-offend** [2] - 47:24, 47:25
**reach** [2] - 37:5, 38:2
**reached** [2] - 8:4, 55:6
**reactions** [1] - 30:14
**read** [16] - 3:5, 3:13, 3:20, 5:15, 9:14, 13:5, 14:15, 25:4, 27:5, 28:10, 30:17, 34:2, 41:9, 48:16, 48:24
**readily** [3] - 32:12, 34:14, 35:19
**reading** [1] - 11:21

**ready** [1] - 13:24
**reality** [1] - 19:10
**realize** [2] - 49:3, 50:1
**really** [15] - 3:15, 15:22, 25:7, 27:9, 27:25, 28:20, 29:25, 37:12, 39:6, 41:4, 44:13, 50:14, 50:17, 51:3, 52:22
**reason** [9] - 8:10, 17:10, 20:9, 20:15, 21:13, 29:19, 29:20, 42:22, 42:23
**reasonable** [2] - 46:13, 58:3
**reasons** [1] - 45:10
**Reavis** [1] - 30:13
**Reavis'** [2] - 30:7, 42:5
**receive** [2] - 42:16, 56:11
**received** [4] - 4:20, 8:12, 9:12, 9:17
**receiving** [1] - 56:24
**recent** [1] - 49:17
**recently** [1] - 49:5
**recess** [1] - 59:5
**Recess** [1] - 59:6
**recidivism** [3] - 33:4, 34:4, 39:18
**recitation** [1] - 44:8
**reckless** [1] - 25:20
**recognize** [1] - 7:22
**recognizes** [1] - 34:22
**recommend** [5] - 35:6, 36:25, 55:14, 55:16, 55:25
**recommendation** [3] - 35:8, 38:6, 47:16
**recommended** [1] - 38:15, 46:8, 46:10
**recommending** [2] - 7:24, 37:13
**reconciling** [1] - 50:17
**reconsider** [1] - 52:7
**record** [3] - 14:2, 47:5, 59:10
**Recorded** [1] - 1:21
**records** [2] - 20:21, 46:22
**recover** [1] - 12:11
**recovered** [1] - 12:9
**recovery** [1] - 49:9
**reduce** [1] - 39:17
**reduces** [1] - 52:16
**reduction** [1] - 37:2
**reenacting** [1] - 32:18
**refer** [1] - 37:20
**referenced** [1] - 12:23
**referring** [1] - 12:7

refresh [1] - 42:21
refusal [1] - 38:18
regard [1] - 48:7
regarding [4] - 4:5, 4:8, 6:7, 56:3
regardless [1] - 22:20
register [1] - 26:13
Registration [1] - 54:6
registration [1] - 54:8
registry [1] - 21:8
rehabilitation [1] - 52:23
rehabilitative [2] - 35:16, 35:17
related [3] - 30:16, 37:17, 49:17
relations [1] - 31:21
relationship [4] - 12:10, 17:5, 17:23, 51:21
relationships [1] - 25:21
relatively [1] - 29:20
release [23] - 21:7, 21:9, 26:10, 34:19, 34:24, 35:14, 38:3, 42:14, 42:19, 45:9, 45:13, 46:5, 46:8, 46:10, 46:16, 46:20, 47:7, 47:9, 52:14, 54:10, 57:10
released [2] - 39:12, 52:4
relevant [4] - 5:18, 7:6, 27:6, 44:13
relive [1] - 3:22
relocated [2] - 10:10, 15:18
reluctant [3] - 12:2, 14:5, 39:4
remain [1] - 48:15
remedied [1] - 29:6
remember [2] - 13:5, 21:10
remorse [1] - 43:20
remorseful [2] - 29:17, 43:20
removed [1] - 29:25
repeat [1] - 27:6
repeated [2] - 17:25, 24:3
repeatedly [2] - 23:5, 55:6
report [16] - 5:23, 5:25, 6:4, 6:6, 6:12, 6:15, 7:17, 7:19, 30:8, 30:13, 38:3, 41:14, 41:17, 42:5, 58:1
reported [4] - 12:22,

23:8, 23:10, 46:22
REPORTER [1] - 1:23
Reporter [1] - 59:14
reports [1] - 56:4
represent [2] - 40:9, 40:18
represented [1] - 40:20
request [1] - 55:18
requested [4] - 21:7, 25:18, 26:8, 26:11
requesting [2] - 21:5, 26:23
requests [4] - 51:23, 53:6, 53:7, 54:3
require [2] - 54:5, 57:23
required [5] - 4:25, 21:9, 26:9, 26:12, 47:2
requirements [1] - 47:9
rescheduled [1] - 3:3
research [1] - 7:7
reside [1] - 54:8
residence [1] - 20:14
resilience [1] - 51:7
resolution [1] - 8:4
resolved [2] - 34:1, 43:25
resources [1] - 44:9
respect [16] - 5:23, 6:13, 7:6, 11:9, 14:12, 15:4, 22:6, 22:10, 22:18, 23:14, 23:16, 24:8, 24:16, 47:21, 47:24, 48:6
respond [2] - 17:14, 24:5
responding [1] - 27:10
Responsibility [1] - 55:12
responsibility [1] - 30:4
rest [1] - 54:4
restitution [3] - 44:7, 55:4, 55:8
resulted [1] - 17:6
return [1] - 42:13
returned [1] - 39:9
reverse [1] - 9:21
review [5] - 5:24, 38:6, 38:17, 38:18, 56:18
reviewed [4] - 4:12, 5:1, 39:10, 55:17
Richman [4] - 2:16, 4:11, 29:21, 41:7
RICHMAN [2] - 1:18, 13:22

ripple [1] - 15:22
rise [2] - 2:3, 59:4
risk [2] - 25:21, 39:18
risky [5] - 25:9, 26:2, 31:13, 41:20, 42:3
River [1] - 22:14
RMR [2] - 1:23, 59:8
Rockville [3] - 46:24, 46:25, 47:1
role [2] - 40:16, 40:17
room [2] - 21:17, 51:6
route [1] - 20:24
routinely [3] - 18:1, 18:2, 36:15
ROY [1] - 1:6
Roy [2] - 2:10, 2:21
RPR [2] - 1:23, 59:8
rules [3] - 36:17, 45:16, 46:1
runaway [2] - 23:8, 23:10
running [1] - 26:1

## S

sad [1] - 25:7
sadly [1] - 32:6
safe [1] - 18:19
safety [8] - 32:20, 32:22, 33:1, 36:23, 39:22, 42:23, 44:16, 45:15
Sandman [2] - 2:24, 41:6
Sandman's [1] - 6:12
save [2] - 50:3, 50:4
saw [3] - 25:5, 42:5, 51:1
scarily [1] - 23:20
scarred [2] - 51:21, 51:22
scheduling [2] - 3:2, 18:21
school [3] - 18:13, 23:24, 26:2
scope [1] - 4:6
scrutiny [1] - 48:4
search [1] - 55:2
searches [1] - 54:19
seated [1] - 48:20
second [1] - 13:10
secure [1] - 43:6
secured [1] - 32:22
see [13] - 3:23, 6:16, 7:16, 12:3, 19:19, 20:2, 32:2, 33:10, 37:21, 44:4, 47:20, 51:9, 51:20
seeing [1] - 35:16

seek [1] - 38:7
seeking [2] - 22:19, 24:2
seized [1] - 32:8
self [1] - 25:20
self-destructive [1] - 25:20
send [5] - 18:4, 19:13, 19:14, 19:23, 33:19
sending [1] - 56:3
Senior [1] - 2:22
sense [7] - 5:19, 9:13, 19:11, 22:7, 27:13, 36:6, 42:20
sent [5] - 3:6, 11:4, 15:19, 20:6, 20:9
sentence [29] - 9:21, 21:4, 21:6, 24:21, 25:17, 26:7, 26:8, 26:23, 27:21, 27:22, 30:24, 34:21, 34:23, 37:2, 38:8, 39:23, 42:12, 43:8, 44:25, 45:11, 45:14, 48:18, 53:16, 54:2, 55:20, 57:3, 57:6, 58:14, 58:16
sentences [3] - 34:6, 34:11, 34:12
SENTENCING [1] - 1:8
sentencing [11] - 5:1, 5:2, 5:8, 6:9, 7:2, 27:4, 33:24, 34:21, 46:22, 47:16, 50:9
sentencings [1] - 35:25
series [1] - 31:12
serious [8] - 15:20, 15:22, 17:16, 21:3, 26:22, 31:7, 42:4, 51:4
seriousness [2] - 22:22, 51:14
serve [3] - 26:9, 42:12, 54:4
served [3] - 28:6, 28:7, 53:18
session [1] - 2:5
sessions [1] - 42:24
set [4] - 18:12, 18:15, 48:4
setting [6] - 10:17, 11:3, 14:7, 15:9, 28:13, 36:15
Seven [1] - 58:7
seven [1] - 19:16
several [4] - 8:19, 28:7, 28:24, 46:21
several-page [1] -

8:19
severe [1] - 24:10
sex [19] - 13:1, 14:16, 21:8, 22:2, 26:13, 36:25, 37:9, 37:14, 42:17, 42:22, 45:22, 51:23, 54:8, 54:10, 55:22, 55:25
Sex [1] - 54:6
sexual [15] - 11:1, 13:6, 14:7, 15:14, 17:2, 18:3, 18:16, 19:8, 20:13, 31:13, 31:21, 33:19, 38:9, 38:19
sexually [3] - 26:1, 37:21, 38:24
share [1] - 47:15
shared [5] - 4:13, 4:15, 40:13, 40:14, 40:15
shoes [1] - 19:5
shorter [1] - 8:21
show [2] - 20:23, 47:8
showed [1] - 20:20
shown [2] - 26:19, 42:1
shows [3] - 20:9, 20:10, 58:1
shy [1] - 52:9
sick [2] - 23:9, 42:10
side [3] - 8:5, 9:4, 28:16
sided [1] - 5:14
significance [1] - 5:11
significant [2] - 21:6, 54:1
silence [1] - 48:16
silent [1] - 48:15
similar [2] - 22:7, 42:2
simply [2] - 5:6, 44:21
sincerely [1] - 49:15
single [5] - 21:13, 34:2, 53:9, 53:10
sister [4] - 2:22, 3:16, 3:24, 10:11
site [1] - 24:9
sitting [2] - 39:5, 40:10
situation [3] - 10:25, 40:24, 49:20
situations [1] - 26:18
slice [1] - 49:23
slow [2] - 41:23, 41:25
small [2] - 30:10, 47:6
society [1] - 49:23
software [1] - 54:14
solely [1] - 20:2
solicit [1] - 25:24
solicitations [2] -

10:13, 19:13
**soliciting** [2] - 18:1, 18:3
**someone** [15] - 11:16, 16:20, 17:3, 18:1, 19:4, 19:5, 22:3, 23:4, 24:1, 24:13, 24:14, 26:16, 33:18, 41:15, 50:3
**sometimes** [9] - 10:3, 28:9, 32:18, 32:19, 33:22, 34:5, 39:4, 41:1, 41:2
**somewhat** [1] - 43:2
**soon** [1] - 58:15
**sorry** [2] - 46:23, 56:22
**sort** [17] - 27:15, 27:23, 30:11, 31:12, 31:15, 31:16, 31:25, 32:9, 34:7, 34:24, 37:7, 37:20, 41:3, 41:24, 42:2, 44:16
**sorts** [4] - 14:13, 18:3, 24:9, 38:16
**sought** [2] - 11:13, 55:5
**SOUTHERN** [1] - 1:2
**speaks** [4] - 36:3, 36:4, 36:5, 36:6
**Special** [2] - 2:13, 5:13
**special** [5] - 55:9, 55:10, 57:18, 57:20
**specific** [2] - 23:18, 54:11
**specifically** [1] - 46:16
**spent** [3] - 28:23, 29:16, 41:6
**spoken** [2] - 37:22, 48:23
**spot** [1] - 18:19
**stable** [1] - 11:3
**staff** [3] - 2:23, 6:19, 56:5
**stage** [4] - 10:22, 15:3, 15:5, 55:6
**Stamp** [2] - 18:23, 19:16
**stand** [1] - 48:20
**standard** [3] - 4:25, 39:3, 54:5
**standpoint** [5] - 12:15, 16:22, 28:20, 28:21
**stands** [2] - 7:10, 59:5
**start** [8] - 5:22, 8:1, 8:8, 9:25, 24:3, 24:9, 41:5, 42:24
**starts** [1] - 9:4
**state** [6] - 22:25, 34:11, 39:6, 39:9,

39:10, 54:8
**statement** [3] - 15:19, 17:7, 48:16
**Statement** [3] - 8:23, 10:15, 11:4
**Statements** [4] - 8:12, 9:17, 26:21
**STATES** [4] - 1:1, 1:3, 1:9, 1:13
**States** [3] - 2:4, 2:10, 2:11
**statistics** [2] - 33:9, 42:5
**statute** [2] - 46:15, 57:21
**statutory** [1] - 7:22
**stay** [2] - 48:20, 56:13
**STE** [1] - 1:24
**steered** [1] - 34:14
**stenographic** [1] - 59:9
**Stenography** [1] - 1:21
**step** [4] - 10:11, 11:20, 13:18, 16:11
**stepmother** [9] - 8:18, 10:10, 11:5, 11:12, 13:3, 13:5, 15:19, 19:17
**steps** [1] - 45:8
**stepsister** [1] - 11:12
**Stevenson** [1] - 2:24
**still** [5] - 23:9, 33:24, 37:19, 39:15, 50:13, 52:19
**stimulation** [1] - 30:14
**stomach** [1] - 29:1
**stood** [1] - 8:10
**stop** [6] - 19:18, 21:17, 21:18, 24:14, 24:15, 27:23
**strange** [3] - 8:16, 8:24, 54:15
**street** [1] - 16:3
**STREET** [1] - 1:19
**strong** [1] - 35:23
**structure** [2] - 12:19, 23:7
**structured** [1] - 45:15
**struggle** [2] - 53:15
**struggles** [1] - 42:4
**stuck** [1] - 49:12
**student** [1] - 54:9
**studies** [3] - 34:2, 34:3, 34:11
**study** [1] - 34:2
**subhuman** [2] - 28:15
**subject** [4] - 28:13, 47:23, 55:1, 55:19
**submission** [4] - 5:2,

25:5, 27:4, 29:8
**submissions** [1] - 27:13
**submit** [3] - 17:12, 20:10, 55:7
**submitted** [1] - 8:12
**substance** [1] - 37:8
**substantial** [2] - 9:21, 44:25
**substantially** [1] - 7:25
**succeeded** [1] - 22:18
**successful** [1] - 39:3
**sufficient** [1] - 53:12
**suggest** [2] - 34:20, 44:18
**suggested** [1] - 45:20
**suggesting** [1] - 25:12
**suicide** [1] - 42:7
**SUITE** [2] - 1:14, 1:19
**summer** [2] - 11:11, 28:14
**Superseding** [2] - 4:10, 58:10
**supervised** [16] - 21:6, 26:10, 34:15, 34:19, 34:24, 35:14, 42:14, 45:12, 45:13, 46:5, 46:8, 46:10, 46:16, 47:7, 52:14, 57:10
**supervision** [11] - 34:24, 35:1, 35:23, 52:3, 52:5, 52:11, 54:4, 54:16, 54:18, 55:11
**support** [3] - 23:6, 51:6, 54:1
**supposed** [3] - 20:7, 27:23, 36:22
**surprisingly** [1] - 34:4
**surrounding** [1] - 14:8
**survive** [1] - 50:1
**suspect** [1] - 43:1
**system** [4] - 6:18, 23:24, 52:15, 56:4
**Szekely** [7] - 2:16, 6:4, 27:2, 35:8, 43:10, 56:8, 56:18
**SZEKELY** [49] - 1:18, 2:15, 2:21, 3:8, 3:12, 4:1, 4:4, 4:16, 4:18, 6:5, 6:16, 6:23, 7:14, 8:7, 13:11, 13:19, 27:3, 28:1, 28:3, 29:11, 29:15, 31:5, 31:8, 31:11, 33:15, 33:21, 34:10, 34:19, 35:12, 35:17, 35:22, 37:16, 37:22, 38:14, 39:21, 43:12, 43:15,

44:15, 46:5, 46:9, 46:19, 47:1, 47:12, 55:17, 55:24, 56:19, 57:1, 57:12, 57:19

### T

**table** [2] - 2:12
**tailored** [1] - 46:16
**talks** [1] - 18:12
**targeted** [2] - 31:2, 33:9
**taught** [1] - 49:20
**teacher** [1] - 23:22
**teachers** [1] - 23:23
**team** [3] - 38:4, 49:13
**technology** [1] - 52:13
**ten** [1] - 35:8
**tend** [1] - 34:12
**term** [3] - 47:7, 47:22, 53:1
**terms** [8] - 9:11, 27:14, 32:11, 32:20, 41:3, 44:1, 46:10, 51:11
**terrible** [1] - 46:4
**testimony** [5] - 4:6, 4:8, 4:19, 4:24
**text** [1] - 9:3
**thankfully** [1] - 22:16
**THE** [94] - 1:1, 1:1, 1:9, 1:12, 1:13, 1:16, 1:17, 2:3, 2:7, 2:14, 2:20, 3:4, 3:11, 3:20, 4:3, 4:14, 5:9, 5:21, 6:2, 6:3, 6:11, 6:21, 6:24, 7:11, 7:15, 7:21, 8:8, 8:15, 9:7, 9:13, 9:16, 9:19, 13:13, 13:16, 13:18, 13:21, 13:25, 14:3, 14:14, 14:19, 14:23, 15:11, 15:15, 21:19, 21:22, 21:24, 22:1, 22:5, 27:1, 27:23, 28:2, 28:4, 29:14, 30:17, 31:6, 31:10, 33:7, 33:16, 34:6, 34:18, 35:4, 35:13, 35:21, 37:11, 37:18, 38:13, 39:13, 43:10, 43:14, 44:4, 45:18, 46:7, 46:18, 46:25, 47:19, 48:10, 48:19, 48:20, 48:22, 50:6, 50:12, 55:8, 55:23, 56:7, 56:23, 57:3, 57:8, 57:15, 58:1, 58:8, 58:12, 59:1, 59:2, 59:4

**themselves** [2] - 28:9, 32:18
**therapist** [2] - 21:24, 40:17
**therapy** [6] - 21:20, 21:25, 41:4, 42:24, 51:9
**therein** [2] - 7:10, 53:15
**third** [1] - 36:16
**third-party** [1] - 36:16
**thousands** [2] - 32:1, 32:2
**threatened** [1] - 25:3
**threats** [3] - 17:22, 32:23, 32:24
**three** [9] - 7:5, 15:4, 15:8, 16:5, 16:14, 20:25, 23:8, 23:11, 29:6
**thrill** [1] - 30:22
**throughout** [1] - 49:16
**Thursday** [1] - 4:5
**tickets** [1] - 22:11
**tied** [1] - 9:23
**Timothy** [1] - 2:11
**TIMOTHY** [1] - 1:14
**tinker** [1] - 56:17
**today** [18] - 2:18, 3:7, 3:10, 4:6, 4:22, 4:25, 6:1, 23:9, 27:7, 33:25, 35:7, 36:4, 36:18, 40:10, 43:22, 53:4, 55:20
**toll** [3] - 20:4, 20:7, 20:22
**Tom** [1] - 2:24
**ton** [2] - 23:23, 33:17
**took** [4] - 13:8, 24:3, 26:18, 30:1
**tool** [1] - 44:19
**tools** [1] - 44:17
**top** [2] - 8:18, 19:17
**total** [1] - 21:1
**totally** [1] - 33:8
**touched** [1] - 29:24
**toward** [2] - 19:16, 21:23
**towards** [1] - 34:14
**TOWER** [1] - 1:19
**track** [2] - 35:19, 47:5
**tragic** [1] - 41:23
**train** [1] - 22:15
**training** [1] - 23:24
**transcript** [1] - 59:9
**TRANSCRIPT** [1] - 1:8
**Transcription** [1] - 1:21
**transfer** [1] - 37:8

**trauma** [5] - 23:4, 30:14, 32:17, 32:18
**trauma-based** [1] - 30:14
**traumatic** [5] - 3:21, 23:3, 25:5, 25:6, 49:4
**traumatized** [2] - 23:5, 32:15
**traumatizes** [1] - 42:7
**travel** [3] - 18:14, 18:15, 46:24
**traveled** [3] - 13:7, 15:13, 20:25
**traveling** [3] - 20:11, 20:18, 46:23
**treat** [2] - 34:20, 43:5
**treatable** [6] - 32:19, 33:3, 38:15, 40:2, 40:3, 45:2
**treated** [2] - 17:4, 43:6
**treatises** [1] - 51:24
**treatment** [26] - 33:5, 34:14, 35:9, 36:13, 37:1, 37:7, 37:8, 37:9, 37:15, 38:19, 39:11, 40:4, 42:16, 42:18, 42:21, 42:25, 43:1, 43:4, 45:4, 45:6, 46:12, 54:11, 55:13, 56:1, 56:2
**tremendous** [1] - 40:21
**tremendously** [2] - 27:22, 40:21
**trial** [5] - 11:10, 15:10, 15:25, 38:25, 39:1
**tried** [1] - 53:24
**trigger** [2] - 38:12, 38:17, 38:20
**triggers** [2] - 38:19, 48:4
**trouble** [2] - 12:20, 12:21
**troubling** [1] - 28:25
**true** [1] - 41:14
**truly** [2] - 29:1, 49:5
**trust** [1] - 33:18
**try** [2] - 53:23, 56:15
**trying** [5] - 19:14, 19:15, 30:11, 34:8, 39:19
**tunnel** [1] - 20:18
**turn** [3] - 7:21, 8:11, 58:19
**turned** [1] - 10:22
**turning** [1] - 29:1
**turnout** [1] - 36:4
**twelve** [1] - 35:9
**twice** [2] - 46:22, 47:1

**two** [9] - 3:9, 13:6, 27:10, 27:17, 29:4, 30:4, 36:4, 45:1, 49:7
**Two** [3] - 57:5, 57:7, 57:8
**type** [1] - 32:10

## U

**U.S** [1] - 35:1
**Uber** [2] - 22:11, 22:15
**Ulander** [1] - 56:9
**ultimately** [3] - 11:24, 24:6, 29:20
**unable** [1] - 49:25
**unannounced** [2] - 54:19, 55:2
**Uncle** [1] - 3:1
**under** [6] - 16:18, 16:19, 34:25, 46:15, 57:1
**undergone** [1] - 39:11
**underreporting** [1] - 33:6
**understood** [1] - 31:5
**undoubtedly** [1] - 44:19
**unfortunately** [3] - 3:2, 32:18, 41:25
**unit** [4] - 42:17, 42:23, 55:22, 55:25
**UNITED** [4] - 1:1, 1:3, 1:9, 1:13
**United** [3] - 2:4, 2:9, 2:11
**unless** [3] - 3:24, 47:10, 47:12
**unlikely** [4] - 38:11, 38:13, 38:14, 38:16
**unprotected** [1] - 22:2
**up** [14] - 5:15, 6:18, 8:15, 10:9, 11:2, 18:12, 18:15, 19:19, 22:13, 41:22, 44:16, 52:21, 53:2, 58:13
**upbringing** [2] - 3:14, 25:7

## V

**V1** [5] - 8:18, 8:23, 9:1, 9:2, 9:7
**V2** [1] - 8:20
**V3** [1] - 8:21
**vacuum** [1] - 5:19
**valuable** [1] - 49:21
**value** [1] - 45:23
**variations** [1] - 33:23
**vehicle** [2] - 20:6,
20:22
**versus** [1] - 2:10
**vial** [1] - 31:3
**victim** [12] - 4:19, 10:16, 10:24, 12:2, 12:16, 12:23, 14:4, 16:1, 16:3, 18:10, 53:10
**Victim** [26] - 8:12, 8:23, 9:16, 10:9, 10:17, 10:19, 11:3, 11:8, 15:13, 15:18, 15:21, 16:4, 17:4, 17:7, 17:18, 18:2, 18:23, 19:17, 22:18, 22:24, 22:25, 23:6, 23:7, 23:14, 26:19, 26:21
**victim's** [5] - 12:13, 20:14, 44:7, 44:8
**Victim-1** [1] - 4:9
**victimized** [1] - 49:16
**Victims** [1] - 22:10
**victims** [8] - 17:1, 21:15, 22:6, 22:21, 24:15, 32:17, 48:13, 51:20
**video** [2] - 19:24, 20:6
**view** [5] - 28:11, 31:15, 53:9, 53:19, 54:2
**viewed** [2] - 38:24, 41:19
**views** [2] - 45:7, 53:1
**violate** [1] - 20:4
**violation** [1] - 47:3
**violence** [1] - 17:22
**voice** [1] - 28:22
**vs** [1] - 1:5
**vulnerabilities** [2] - 26:17, 50:24
**vulnerability** [1] - 22:24
**vulnerable** [4] - 10:20, 16:19, 24:4, 30:25

## W

**wage** [1] - 58:3
**waived** [1] - 57:21
**walk** [1] - 5:11
**wants** [9] - 19:15, 40:3, 42:11, 42:12, 42:13, 43:16, 43:18, 47:15
**warn** [1] - 54:25
**warned** [3] - 19:22, 21:16
**warning** [2] - 24:13, 24:14
**warnings** [1] - 25:23
**warrant** [1] - 23:21
**warrants** [1] - 54:2
**watch** [1] - 43:10
**watched** [1] - 47:21
**water** [1] - 28:13
**ways** [7] - 23:6, 24:17, 25:10, 30:19, 40:20, 45:18, 45:19
**week** [2] - 46:22, 47:1
**weighing** [1] - 51:18
**welcome** [1] - 2:14
**well-being** [1] - 36:20
**well-crafted** [1] - 56:10
**well-done** [1] - 7:18
**well-established** [1] - 48:1
**well-shown** [1] - 42:1
**whole** [2] - 28:14, 51:22
**wholly** [1] - 50:13
**wife** [1] - 25:21
**willing** [1] - 40:6
**willingness** [1] - 3:17
**Willis** [1] - 2:25
**winter** [1] - 28:14
**wisdom** [1] - 27:20
**wish** [7] - 3:25, 48:7, 48:14, 48:17, 55:15, 56:17, 58:18
**wished** [1] - 27:7
**wishes** [3] - 8:5, 31:7, 47:13
**witness** [3] - 10:4, 16:4, 42:7
**witnessed** [1] - 41:24
**witnesses** [2] - 3:15, 8:5
**woman** [1] - 11:4
**women** [1] - 31:13
**wonder** [1] - 17:13
**wonders** [1] - 30:18
**word** [1] - 50:23
**words** [1] - 58:22
**works** [2] - 53:13, 58:24
**world** [4] - 31:19, 33:13, 40:5, 50:2
**worried** [1] - 23:9
**worth** [1] - 58:2
**wrap** [1] - 44:16
**write** [2] - 58:19, 58:21
**writing** [1] - 49:2
**written** [1] - 3:5
**wrote** [2] - 30:13, 49:1

## X

**XINIS** [1] - 1:9
**Xinis** [1] - 2:5

## Y

**year** [2] - 37:2, 40:9
**year's** [1] - 20:25
**years** [11] - 7:23, 10:22, 25:18, 35:8, 35:9, 44:24, 49:7, 49:11, 50:17, 53:17
**young** [5] - 10:13, 25:24, 30:25, 38:22, 43:11
**yourself** [2] - 41:5, 51:3

## Z

**zealously** [1] - 40:18